593 So.2d 483 (1991)
Anthony John PONTICELLI, Appellant,
v.
STATE of Florida, Appellee.
No. 73064.
Supreme Court of Florida.
October 10, 1991.
Rehearing Denied March 9, 1992.
*485 James B. Gibson, Public Defender and Michael S. Becker, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and David S. Morgan, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Anthony J. Ponticelli appeals his convictions of first-degree murder and sentences of death. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentences.
According to testimony at trial, on November 27, 1987, Ponticelli was invited to watch video movies at the home of Keith Dotson, whom Ponticelli met while at a convenience store that afternoon. Ponticelli arrived at Dotson's house between 6:30 and 7:00 p.m. and stayed thirty to forty-five minutes. Later that evening he returned to Dotson's house in an automobile. Upon his return, Ponticelli told Dotson's cousin, Ed Brown, that there were two people in the car whom he intended to kill for money and cocaine. Ponticelli showed Brown a gun and told him he would need a ride back to his house. Brown agreed to give him a ride and gave Ponticelli Dotson's telephone number. When the phone later rang several times, Dotson and his friends intentionally did not answer it. Around 11:30 p.m., Ponticelli returned to Dotson's house in a taxi cab. He told those present that he had killed the two people in the car for cocaine and $2,000. Ponticelli asked Brown if he thought that a person would live after being shot in the head. Although Brown told him he did not think he had to worry about it, Ponticelli expressed concern, telling Brown that he had heard one of his victims moaning. After Ponticelli washed his clothes to remove blood stains, Brown drove him home.
According to testimony of Timothy Keese, who lived with Ralph and Nick Grandinetti, on the evening of November 27, Keese saw Ponticelli at the Grandinetti brothers' home around 7:30 p.m. The three were discussing money Ponticelli owed the brothers for cocaine he had purchased from Ralph. Ponticelli told the brothers that he would sell whatever cocaine they had and then settle up with them. The brothers agreed to take Ponticelli to sell the cocaine. Keese left the house; and when he returned around 10:00 p.m. the Grandinettis were not at home. The brothers did not return that night.
The Grandinettis were found in their car the following day. Nick was found badly injured with his head on the floorboard of the car. He was gasping for air and kicking his foot when found. Nick's head was covered with blood and there was blood spattered all over the car. Ralph was found dead in the back seat. According to the medical examiner, Ralph died within one to two minutes of being shot once in the back of the head at close range.
Nick Grandinetti survived until December 12, 1987. An autopsy revealed that he had suffered two gunshot wounds to the back of the head. There were a number of bruises on the back and side of his head that were consistent with blunt trauma to the head. The skin on the right ear was peeling and red which was consistent with *486 hot pressure being placed on the ear for an extended period of time. Nick died of cardiac arrest which was secondary to the gunshot wounds.
Ponticelli's best friend, Joseph Leonard, testified that around 9:30 p.m. on November 27, Ponticelli came to Leonard's house and returned a gun Leonard had given him. Ponticelli told Leonard that he "did Nick" which Leonard understood to mean that Ponticelli had shot and killed Nick Grandinetti. Ponticelli asked Leonard and his roommate what he should do with the bodies.
Leonard further testified that the next day Ponticelli told him that the Grandinettis had been harassing him about money that he owed them and were not going to let him leave their house until they got their money. The three left in a car. Ponticelli directed the brothers around the back roads trying to sell their cocaine. He then shot them both in the head. After dropping the gun off at Leonard's house, he had a flat tire so he left the bodies and took a cab home. Leonard eventually gave the police the murder weapon and a statement. After the murder weapon was given to police and statements from Leonard and his roommate were taken, Ponticelli was arrested.
There was also testimony that on the Sunday after the shootings, Ponticelli burned some clothes in Ronald Halsey's back yard. When asked why he was burning the clothes, Ponticelli told Halsey that he had shot two men whom he owed money for cocaine. He told Halsey that he shot both of the men in the back of the head and threw one of them in the back seat. The other man was still moving so he hit him a couple of times in the head with the butt of the gun. He parked the car when he had a flat tire and took several grams of cocaine and $900 in cash.
After his arrest for the murders, Ponticelli discussed the murders with a cellmate, Dennis Freeman, who testified at trial. According to Freeman, Ponticelli asked him if he would help him dispose of some evidence and drew Freeman a map showing the location of the evidence. The map had Keith Dotson's name and telephone number on it. Ponticelli told Freeman that he made several phone calls from the victims' house to get them to believe that he was trying to sell cocaine for them. He thought about killing the brothers at their home but there were other people there, so he asked the brothers to take him to Keith Dotson's house to sell the cocaine. After leaving Dotson's house, they drove to a place where he killed them. Ponticelli told Freeman that he shot the driver first with two shots to the head and then shot the passenger once in the head. One of the men was still alive. Ponticelli then drove to Joey Leonard's house, where he told Leonard and his roommate what he had done. He gave Leonard the gun and discussed disposing of the bodies. After he left Leonard's house, he had a flat tire, so he abandoned the car. He took a cab to Dotson's house where he washed his clothes which he later burned. Ponticelli told Freeman that he shot the brothers because he wanted to rob them of cocaine and money.
Ponticelli was charged with two counts of first-degree murder and one count of robbery with a deadly weapon. At the close of the state's case-in-chief, a judgment of acquittal was entered as to the robbery charge. The jury found Ponticelli guilty of both counts of first-degree murder and recommended that he be sentenced to death for each murder. The trial court sentenced Ponticelli to death in connection with both convictions. The court found two aggravating factors[1] applicable to both murders and a third factor[2] applicable to the murder of Nick Grandinetti and two mitigating factors in connection with both murders.[3]
*487 Ponticelli raises the following twelve claims in this appeal: 1) the trial court erred in finding appellant competent to stand trial; 2) the trial court erred in denying appellant's motion to suppress statements made to investigators; 3) the trial court erred in preventing appellant from presenting the testimony of an expert in the field of behavioral psychology; 4) the trial court erred in limiting the defense's voir dire examination; 5) the trial court erred by refusing to grant a mistrial after a state witness was allowed to testify regarding the potential danger he faced as a result of his testimony where such danger was never connected to the defendant; 6) the trial court erred by admitting a photograph of the victim which was cumulative to photographs already in evidence and allowing extended publication of photographs to the jury; 7) the trial court erred in permitting the state to elicit irrelevant and prejudicial testimony during the penalty phase; 8) the trial court erred in finding the murder of Nick Grandinetti heinous, atrocious or cruel, under section 921.141(5)(h), Florida Statutes (1987); 9) the trial court erred in finding the murders were committed in a cold, calculated and premeditated manner, under 921.141(5)(i); 10) sections 921.141(5)(h) and (i) are unconstitutionally vague and applied in an arbitrary and capricious manner; 11) the trial court erred in its consideration of valid unrebutted mitigating factors; 12) Florida's capital sentencing statute is unconstitutional on its face and as applied. Only seven of these claims merit discussion.[4]

GUILT PHASE
Ponticelli first claims that the trial court erred in finding him competent to stand trial because one of the three experts appointed to examine him testified that in his opinion Ponticelli was incompetent. Although Dr. Mills testified that Ponticelli was not competent to stand trial because he suffered from delusional thought processes, both Dr. Poetter and Dr. Krop testified that he was competent.
It is incumbent upon the trial court, as finder of fact in competency proceedings, to consider all the evidence presented and to render a decision based on that evidence. Carter v. State, 576 So.2d 1291 (Fla. 1989), cert. denied, ___ U.S. ___, 112 S.Ct. 225, 116 L.Ed.2d 182 (1991). However, where there is conflicting expert testimony on competency, it is the court's responsibility to resolve the disputed factual issue. Fowler v. State, 255 So.2d 513, 514 (Fla. 1971); King v. State, 387 So.2d 463 (Fla. 1st DCA 1980). Absent a showing of abuse of discretion, the decision of the trial court on such matters will be upheld. 576 So.2d at 1292. The record contains sufficient evidence that Ponticelli understood the charges against him and could assist in his defense to support the trial court's ruling.
Next, we address Ponticelli's claim that statements made to Investigator Munster should have been suppressed because they were taken in violation of his fifth and sixth amendment rights. Prior to trial, Ponticelli filed a motion to suppress four statements made to Investigator Munster alleging that they were involuntary in that they were taken after Ponticelli had requested an attorney and were made in response to assurances that they could not be used against him. The motion was denied without the benefit of testimony. At trial, the state sought to have the taped statements, the first three of which were taken before Ponticelli's arrest, played to the jury. As the first tape was being played to the jury, the trial judge had the tape stopped and stated that if he had heard the exact comments made by the investigator *488 to Ponticelli, he would have suppressed the statement at the hearing. The trial judge concluded that although the investigative subpoena that had been prepared had not been served, it was "clear that the statement was given in response to the threat of the subpoena and that Investigator Munster told [Ponticelli] that the statement wouldn't be used against him."[5] Although the trial judge reversed his ruling and granted the motion to suppress as to the first statement, he allowed the other three taped statements to be played to the jury.
We find no merit to Ponticelli's claim that the other three statements should have been suppressed because they were taken after he expressed a desire for an attorney at the end of his first statement. Ponticelli was not in police custody at the time of his request for counsel or at the time the second and third statements were made. See Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (when accused invokes right to have counsel present during custodial interrogation, the accused is not subject to further interrogation until counsel has been made available, unless the accused initiates further communication). Although he was in custody at the time of his fourth statement, this statement was taken after full Miranda[6] warnings were given and a voluntary waiver of rights occurred. Further, Ponticelli's sixth amendment right to counsel had not yet attached because judicial criminal proceedings had not begun. Kirby v. Illinois, 406 U.S. 682, 689-90, 92 S.Ct. 1877, 1882-83, 32 L.Ed.2d 411 (1972).
Turning to Ponticelli's next ground for suppression, the trial court correctly ruled that Ponticelli's first statement must be suppressed. A promise of immunity, calculated to extract a confession or incriminatory statement, renders the statement involuntary. See In re G.G.P, 382 So.2d 128 (Fla. 5th DCA), review denied, 389 So.2d 1114 (Fla. 1980); Frazier v. State, 107 So.2d 16 (Fla. 1958). While we find no error in connection with the third and fourth statements, we agree with Ponticelli that it was error to admit the second statement made prior to his arrest because it too was taken amidst assurances that the statement would not be used against him.[7] However, any error was harmless beyond a reasonable doubt. In each of the challenged statements, Ponticelli maintained that he saw someone else kill the brothers. In light of the other evidence against Ponticelli, there is no reasonable possibility that the inadmissible statements or references thereto affected the verdict. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Ponticelli's fifth claim concerns testimony of his former cellmate, Dennis Freeman. At the beginning of Freeman's testimony on direct examination the following exchange occurred:
Prosecutor: Have you gotten any special treatment, any benefits, anything at all in exchange for what you're going to tell this jury?
Witness: No, I have not.

*489 Prosecutor: Is it, in fact, a dangerous situation for you to be here testifying?
Witness: Most definitely.
Prosecutor: Why is that?
Witness: Well, because of the area that I'm situated in the jail, it's open population.
Prosecutor: If someone in the jail found out that you were doing this, you could be in danger?
The defense objected because "[a]ny danger [the witness] may be in may be attributed" to the defendant. Defense counsel then requested a curative instruction and moved for a mistrial due to the alleged prejudicial effect of this line of questioning. The trial court overruled the objection but required the state to clarify that the defendant did not pose a threat to the witness. The questioning proceeded:
Prosecutor: Mr. Freeman, you were telling the jury that you felt that you could possibly be in danger as a result of testifying here in court. Danger from other inmates that you are currently housed with at the jail?
Witness: Yes, ma'am.
Prosecutor: Now, you're not currently housed with the defendant?
Witness: No, ma'am.
Although no challenge to the curative effect of this questioning was raised by defense counsel, Ponticelli now maintains that this exchange failed to clarify the testimony, instead implying that he was somehow "arranging" for other inmates to harm Freeman.
Ponticelli is correct that threats made against a witness are inadmissible to prove guilt unless the threats are shown to be attributable to the defendant. Koon v. State, 513 So.2d 1253 (Fla. 1987), cert. denied, 485 U.S. 943, 108 S.Ct. 1124, 99 L.Ed.2d 284 (1988); Duke v. State, 106 Fla. 205, 142 So. 886 (1932). However, the state maintains that the testimony was not offered to prove guilt but was offered as anticipatory rehabilitation under this Court's decision in Bell v. State, 491 So.2d 537 (Fla. 1986). See Koon v. State, 513 So.2d at 1256 ("The fact that a witness has been threatened with respect to his testimony may bear on his credibility regardless of who made the threat.").
While we reject the state's contention that eliciting testimony from a witness on direct examination that he is testifying for the state despite possible reprisals from other inmates because he feels it is "morally right" is proper anticipatory rehabilitation, we find any error in admitting this testimony harmless. Cf. State v. Price, 491 So.2d 536 (Fla. 1986) (testimony concerning third-party threats may be deemed so prejudicial as to require its exclusion even where it would otherwise be properly admissible under a recognized theory of evidence). Freeman's testimony did not concern actual threats that jurors could have reasonably inferred to have been encouraged by Ponticelli. Further, it is clear from the testimony that Freeman feared reprisals from the general inmate population, a fear which is typical of any inmate who testifies on behalf of the state and is less likely to lead to the improper inference that possible reprisals are somehow attributable to the defendant. Moreover, on this record, there is no reasonable possibility that the verdict was affected by any improper bolstering of the witness' credibility which may have resulted from this line of questioning. DiGuilio.
Although Ponticelli does not challenge the sufficiency of the evidence to support his convictions, our review of the record reveals that the verdicts are supported by competent and substantial evidence of guilt. Finding no reversible error during the guilt phase of the trial, the convictions of first-degree murder are affirmed.

PENALTY PHASE
In connection with the penalty phase of the trial, first, we find no merit to Ponticelli's claim that the trial court erred in finding the murder of Nick Grandinetti especially heinous, atrocious or cruel. This was clearly more than a simple shooting. See Lewis v. State, 398 So.2d 432, 438 (Fla. 1981) ("murder by shooting, when it is ordinary in the sense that it is not set apart *490 from the norm of premeditated murders, is as a matter of law not heinous, atrocious, or cruel"); see also McKinney v. State, 579 So.2d 80, 84 (Fla. 1991). It appears from the evidence that Nick Grandinetti was shot twice; then while still conscious, he was struck several times in the head with the butt of the gun and driven around with his head pushed down on the hot floorboard. The evidence suggests that Nick's right ear was burned by the heat from the floorboard. According to the medical examiner, Nick would have experienced pain from the time he was shot until he became comatose. These facts are sufficient to set this murder apart from the norm of capital felonies and to support the conclusion that Ponticelli was, at best, utterly indifferent to the suffering he caused. Shere v. State, 579 So.2d 86 (1991); Cheshire v. State, 568 So.2d 908, 912 (Fla. 1990); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974); accord Jackson v. State, 522 So.2d 802 (Fla.) (factor upheld where victim who remained conscious after initial gunshot wound was required to get into laundry bag and lie on floor of car while he was driven around), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Huff v. State, 495 So.2d 145, 153 (Fla. 1986) (factor upheld where victim of double homicide was shot twice in the head but remained conscious and was struck eight or nine times with pistol before being killed with a third shot).
Likewise, we reject Ponticelli's challenge to the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. There is sufficient evidence of the heightened premeditation required to support this aggravating circumstance. Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The evidence establishes that these were execution-style murders that were carefully planned before the crime began. See McKinney v. State, 579 So.2d at 84-85; Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).
According to testimony, Ponticelli considered killing the Grandinettis in their home but, because there were others present, he got the brothers to leave with him, using the pretext that he would sell cocaine for them. Ponticelli instructed them to drive him to Keith Dotson's house, where he announced his intention to kill the brothers for money and cocaine and arranged to be picked up after the murders. He then returned to the car and had the brothers drive him around, ostensibly looking for drug buyers, until he shot them both in the back of the head, execution style.
Next, we reject Ponticelli's contention that it was error to allow the state to elicit Dr. Mill's opinion that Ponticelli had the ability to differentiate between right and wrong and to understand the consequences of his actions. While this testimony is clearly relevant to a determination of a defendant's sanity, it is also relevant in determining whether mitigating circumstances exist under section 921.141(6)(b) (the defendant was under the influence of extreme mental or emotional disturbance), or section 921.141(6)(f) (defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired). Further, while the trial court below referred to the "M'Naghten criteria" in rejecting these mitigating factors, it specifically considered these mental mitigating factors in its sentencing order and used M'Naghten criteria as but one consideration leading to their rejection, unlike the courts in Ferguson v. State, 417 So.2d 631 (Fla. 1982), and Mines v. State, 390 So.2d 332 (Fla. 1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981).
Finally, we reject Ponticelli's claim that the trial court erred in failing to consider valid unrebutted mitigating evidence. In rejecting the mitigating factor that the defendant was under the influence of extreme mental or emotional disturbance at the time of the murders, the court found Dr. Mills' testimony in support of this *491 factor "mere speculation." Ponticelli had not discussed his mental processes or any of the details of the offense with Dr. Mills, and the only evidence to support Dr. Mills' opinion was Ponticelli's use of cocaine and the description of his hyperactivity on the evening of the murders, although there was no evidence of drug use on the evening of the murders.
The trial court also rejected as a mitigating circumstance the fact that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. In rejecting this factor, the court again considered the fact that there was no evidence that Ponticelli was using cocaine at the time of the murders to support Dr. Mills' opinion that this factor applied. The court considered expert testimony given during the competency hearing. It also considered testimony concerning Ponticelli's actions on the night of the murder evincing that his capacity to appreciate the criminality of his conduct was not impaired. Our review of the record reveals that there is competent substantial evidence to support the trial court's rejection of these mitigating circumstances. See Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990) (trial court may reject defendant's claim that a mitigating factor exists if the record contains competent substantial evidence to support rejection).
Accordingly, the convictions of first-degree murder and sentences of death are affirmed.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The murders were committed for pecuniary gain, and the murders were committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.
[2] The murder was especially heinous, atrocious or cruel.
[3] In mitigation the court found that Ponticelli had no significant history of prior criminal activity, and that he was twenty years old at the time of the offense.
[4] Ponticelli's third, fourth, and sixth claims merit no discussion. His tenth claim regarding the constitutionality of the aggravating factors of heinous, atrocious, or cruel, and cold, calculated, and premeditated previously has been rejected by this Court. Robinson v. State, 574 So.2d 108, 113 n. 6 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991). His twelfth claim challenging the constitutionality of the death penalty statute likewise has been rejected. Van Poyck v. State, 564 So.2d 1066 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991).
[5] The following exchange occurred at the beginning of the first statement:

Q. I told you that I have an Investigative Subpoena for you for this afternoon at the State Attorney's Office to meet with Assistant State Attorney Jim Phillips concerning this homicide investigation, correct?
A. Correct.
Q. I explained to you that Investigative Subpoena will give you immunity for what you say today at this this a [sic] subpoena hearing, correct?
A. Correct.
Q. And I told you that none of that could be used against you, correct?
A. Correct.
Q. All right, now I want to talk about the murder, just so we got all that straight and I'm not lying to you about anything, you believe me when I tell you that, don't you, there's no tricks, no traps, all I want is the truth, you understand that?
A. Yah.
.....
Q. I told you I can't use this against you, all I want you to do is tell the truth.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] During the second statement which was taken several hours after the first when Investigator Munster met Ponticelli at his parents' house, Ponticelli was reminded of the earlier assurance that "if you're a witness it'd be all right" and "you can't get in trouble for telling the truth if you're just a witness."