595 So.2d 1 (1992)
Jacob John DOUGAN, Appellant,
v.
STATE of Florida, Appellee.
No. 71755.
Supreme Court of Florida.
January 2, 1992.
Rehearing Denied April 1, 1992.
*2 James E. Ferguson, II of Ferguson, Stein, Watt, Wallas & Adkins, P.A., Charlotte, N.C., for appellant.
Robert A. Butterworth, Atty. Gen. and Gary L. Printy, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
We again review a sentence of death imposed on Jacob John Dougan, Jr., for a homicide committed on June 17, 1974.[1] This Court affirmed two prior death sentences, but later vacated them and remanded for resentencing; the findings of guilt have been affirmed.[2]
The trial judge accurately set forth the facts of this murder in his sentencing order:
The four defendants, Jacob John Dougan, Elwood Clark Barclay, Dwyne Crittendon, and Brad W. Evans, were part of a group that termed itself the "Black Liberation Army" (BLA), and whose apparent sole purpose was to indiscriminately kill white people and thus start a revolution and racial war.
Dougan was the group's unquestioned leader and it was he who conceived the murderous plan. Apparently he did not have to break down a wall of morality to induce Barclay, Crittendon, and Evans to participate  but it was Dougan's plan  and he pushed it through to murderous finality. The act of Dougan in firing the *3 fatal shots and his leadership were undoubtedly reasons the jury recommended death only for him.
The trial testimony showed that on the evening of June 17, 1974, the four defendants and William Hearn (who testified for the State) all set out in a car armed with a pistol and a knife with the intent to kill a "devil"  the "devil" being any white person they came upon under such advantageous circumstances that they could murder him, her, or them.
As they drove around Jacksonville, they made several stops and observed a number of white persons as possible victims, but decided the circumstances were not advantageous and that they might be seen and/or thwarted by witnesses. At one stop, Dougan wrote out a note  which was to be placed on the body of the victim ultimately chosen for death.
Eventually, the five men drove towards Jacksonville Beach, where they picked up a white hitchhiker, 18-year-old Stephen Anthony Orlando. Against Orlando's will and over his protest, they drove him to an isolated trash dump, ordered him out of the car, stabbed him repeatedly, and threw him to the ground. As the 18-year-old youth writhed in pain and begged for his life, Dougan put his foot on Orlando's head and shot him twice  once in the chest and once in the ear  killing him instantly.
Subsequent to the murder, Dougan made several tape recordings bragging about the murder, which were mailed to the victim's mother as well as to the media. The following excerpt from one of the tapes aptly illustrates the content:
The reason Stephen was only shot twice in the head was because we had a jive pistol. It only shot twice and then it jammed; you can tell it must have been made in America because it wasn't worth a shit. He was stabbed in the back, in the chest and the stomach, ah, it was beautiful. You should have seen it. Ah, I enjoyed every minute of it. I loved watching the blood gush from his eyes.
The jury recommended the death sentence by a vote of nine to three. The trial court found three aggravating circumstances and no mitigating circumstances and sentenced Dougan to death. Dougan raises numerous points on appeal, only some of which merit discussion.[3]
The prosecutor exercised several peremptory challenges against black prospective jurors, and Dougan now argues that he failed to give racially neutral explanations for those excusals. The trial court, however, has broad discretion in determining if peremptory challenges are racially motivated. Reed v. State, 560 So.2d 203 (Fla.), cert. denied, ___ U.S. ___, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990). Our review of the record shows no abuse of discretion in the trial court's acceptance of the prosecutor's explanations of the peremptory challenges. Thus, we find no merit to Dougan's first point on appeal.
Subsection 921.141(2), Florida Statutes (1987), provides:
(2) ADVISORY SENTENCE BY THE JURY.  After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);
(b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and
(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.
The instructions and jury's recommendation form used in this case tracked the *4 language of the statute. During deliberations, however, the jury asked the court if it could recommend life imprisonment "in the event that the jury decides that sufficient aggravating circumstances exist to justify a death sentence and that sufficient mitigating circumstances do not exist." After conferring with the parties, the court told the jury to answer each question on the recommendation form "as you deem appropriate from the law and the evidence." Dougan now argues that the jury should be allowed to recommend life imprisonment regardless of its findings as to aggravating and mitigating circumstances. We disagree.
A jury may, in its discretion, decide to grant a "jury pardon" in deciding a defendant's guilt. E.g., Amado v. State, 585 So.2d 282 (Fla. 1991). On the other hand, "where discretion is afforded ... on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 188-89, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). As pointed out by the United States Supreme Court, "there is no ... constitutional requirement of unfettered sentencing discretion ..., and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.'" Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990) (quoting Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988)). To that end, death penalty statutes must restrain and guide the sentencing discretion to ensure "that the death penalty is not meted out arbitrarily and capriciously." California v. Ramos, 463 U.S. 992, 999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983). Cf. California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ("death penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion.").
Under subsection 921.141(2) death may be the appropriate recommendation if, and only if, at least one statutory aggravating factor is established. After an aggravator has been established, any mitigating circumstances established by the evidence must be weighed against the aggravator(s). Florida's death penalty statute, and the instructions and recommendation forms based on it, set out a clear and objective standard for channeling the jury's discretion.
Dougan's claim that the jury should be allowed to disregard the statutory directions and guidance would engender arbitrariness and capriciousness in jury recommendations. This is improper because
[i]t is no doubt constitutionally permissible, if not constitutionally required, for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our long-standing recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary. At the very least, nothing ... prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "reasoned moral response," rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice.
Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415 (1990) (citations omitted). Thus, we find no error in the trial court's directing the jury to follow the mandate of subsection 921.141(2).
*5 We also find no merit to Dougan's other arguments about the instructions on mitigating evidence. The standard jury instruction on nonstatutory mitigating evidence is not ambiguous and allows jurors to consider and weigh relevant mitigating evidence. Robinson v. State, 574 So.2d 108 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991). Dougan's contention that evidence of no prior criminal history can be rebutted only by convictions is incorrect. Walton v. State, 547 So.2d 622 (Fla. 1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990).
The trial court found that three aggravators had been established  committed during a kidnapping; heinous, atrocious, or cruel; and committed in a cold, calculated, and premeditated manner. As nonstatutory mitigating evidence, the court specifically considered Dougan's civil rights activities, his community social, health, and welfare work, his family and personal background, his codefendants' lesser sentences, and the racial unrest at the time of this murder. The court held that, on this record, the evidence did not mitigate the penalty. Now, Dougan claims that the trial court erred both in finding that the aggravators had been established and in not finding that mitigators had been established. We disagree.
Dougan states that the mitigating evidence related to four areas: 1) positive character traits; 2) contribution of racial oppression to the homicide; 3) potential for rehabilitation; and 4) inequality between his sentence and those of his codefendants and argues that the court erred in not finding that mitigators had been established. It is apparent from the judge's written findings that he considered these matters. Based on his evaluation of the evidence, however, he decided that the facts of this case did not support Dougan's contention that these matters constituted mitigating circumstances. Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Deciding whether particular mitigating circumstances have been established and, if established, the weight afforded it lies with the trial court, and a trial court's decision will not be reversed because an appellant reaches the opposite conclusion. Sireci v. State, 587 So.2d 450 (Fla. 1991); Stano v. State, 460 So.2d 890 (Fla. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). We find no reversible error regarding consideration of the evidence Dougan presented in his attempt to mitigate his sentence.
We likewise find no error in the trial court's holding three aggravators to have been established. The evidence fully supports finding this murder to have been committed during a kidnapping. The facts also set this murder apart from the norm of killing by illustrating the victim's suffering and Dougan's indifference to the victim's pleas and support finding the heinous, atrocious, or cruel aggravator. Cf. Ponticelli v. State, 593 So.2d 483 (Fla. 1991), and cases cited therein. Finally, the planning and execution of this murder demonstrate the heightened premeditation needed to find it had been committed in a cold, calculated, and premeditated manner. Cf. Cruse v. State, 588 So.2d 983 (Fla. 1991); Rogers. As discussed later, Dougan had no colorable claim of any moral or legal justification for this killing.
Turning to Dougan's final point, we disagree that death is disproportionate in this case. There was no suggestion that Dougan is mentally deficient. To the contrary, he is intelligent and articulate and a leader among men. In fact, he recruited his codefendants while teaching them karate. He knew precisely what he was doing.
The dissent suggests that because Dougan has suffered a life of racial prejudice and that this murder was related to this, his sentence should be reduced to life. We do not minimize the injustices perpetrated by our society upon the black race. However, it must be noted that Dougan suffered less from the racial discrimination that occurred while he was growing up than many others of his race. Although abandoned by his mother, he was adopted at the age of two and one-half years by loving parents who provided him with a *6 stable environment. Several witnesses said that he was well liked in high school, and he achieved the rank of Eagle Scout. There was no evidence that he suffered any racial discrimination not common to all of the black community.
We disagree with the dissent that this pitiless murder should be equated with the emotional circumstances often existent in homicides among spouses. While Dougan may have deluded himself into thinking this murder justified, there are certain rules by which every civilized society must live. One of these rules must be that no one may take the life of another indiscriminately, regardless of what that person may perceive as a justification.
Our review must be neutral and objective. This Court recently upheld the death penalty in the indiscriminate killing of two blacks by a white defendant. Asay v. State, 580 So.2d 610 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). The circumstances of this case merit equal punishment. To hold that death is disproportionate here would lead to the conclusion that the person who put the bomb in the airplane that exploded over Lockerbie, Scotland, or any other terrorist killer should not be sentenced to death if the crime were motivated by deep-seated philosophical or religious justifications.
We have reviewed the other issues Dougan raises[4] and find no reversible error. Therefore, we affirm the sentence of death.
It is so ordered.
OVERTON, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in result only.
McDONALD, J., dissents with an opinion, in which SHAW, C.J., and BARKETT, J., concur.
McDONALD, Justice, dissenting.
This case is unique; it is also a case of contrast. Dougan's counsel describes the events as a tragic aberration while others view them as frightening, inexcusable, and callous. In the entire bizarre series of events leading to and following the murder by "an unacceptable act of violence upon an unsuspecting white youth," Dougan was the leader and the planner.
Substantial evidence was presented at the last sentencing proceeding to assist the jury, the trial judge, and this Court in determining the appropriate sentence. The jury recommended death,[5] which the trial judge imposed. He found that the homicide was cold, calculated, and premeditated without any pretense of moral justification, that in its planning it was especially cruel and atrocious and in its execution especially heinous, and that there was a kidnapping to facilitate the crime. The trial judge either rejected mitigating circumstances or found them to be so insignificant that they did not outweigh the aggravating ones.
It is not our function on review to re-weigh the evidence, but, rather, to determine whether the trial judge's findings and conclusions are supported by the record. There is evidence to support the conclusions of the trial judge on the aggravating factors, even though in the mind of Dougan there was a pretense of moral justification for his acts. On the other hand, it is our responsibility to review the totality of the circumstances to determine whether death is appropriate when compared to other death sentences. Adams v. State, 412 So.2d 850 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982); Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). We have reduced death sentences to life imprisonment after reviewing both the aggravating and mitigating circumstances as shown in the record and concluding that death is not *7 warranted. E.g., Halliwell v. State, 323 So.2d 557 (Fla. 1975).
Dougan's mother was white and his father, whom he never knew, was black. After Dougan's birth, his mother returned to an all white community where she abandoned her son. Although as much white as black, Dougan was rejected by his white relatives and the white population. Ultimately he was adopted by an understanding and compassionate family which also came from a biracial background. An intelligent person, Dougan was well educated and became a leader in the black community, but throughout his life was confronted with a perception of injustice in race relations. Within the black community he was respected. He taught karate and counseled black youths. When blacks were refused service at a lunch counter, he participated in a sit-down strike in defiance of a court order and was held in contempt of court therefor. This was the only blemish, if it can be called one, on his police record until this homicide.
The events of this difficult case occurred in tumultuous times. During the time of the late sixties and early seventies, there was great unrest throughout this country in race relations. Duval County, where this homicide occurred, did not escape and was also a place of such unrest. I mention these facts not to minimize what transpired, but, rather, to explain the environment in which the events took place and to evaluate Dougan's mind-set.
The trial judge was aware of everything I have stated. Indeed, he substantially recited these facts in his sentencing order. His final conclusion was that the grossness of the homicide clearly outweighed any other factor or combination thereof which may have lessened the ultimate penalty. The majority agrees, but I cannot.
We have said that the death penalty is reserved for those cases where the most aggravating and least mitigating circumstances exist.[6] We must determine whether Dougan belongs to that class of killers for whom the death penalty is the appropriate punishment. In resolving that issue and mindful of the factors set forth in section 921.141, Florida Statutes (1973), and established case law, we must carefully review what was done, how it was done, why it was done, and what kind of a person did it. How the public views these factors depends to a large extent upon the vantage point or perception of those looking at them. Understandably, in the eyes of the victim, or potential victims, the aggravating factors clearly outweigh the mitigating; in the eyes of the defendant, his friends, and most of those situated in the circumstances of Dougan, the death penalty is not warranted and is disproportionate to the majority of hate slayings, at least where the victim is black and the perpetrator is white.
Even though we are aware of and sensitive to these contrasting emotions, our review must be neutral and objective. This case is not simply a homicide case, it is also a social awareness case. Wrongly, but rightly in the eyes of Dougan, this killing was effectuated to focus attention on a chronic and pervasive illness of racial discrimination and of hurt, sorrow, and rejection. Throughout Dougan's life his resentment to bias and prejudice festered. His impatience for change, for understanding, for reconciliation matured to taking the illogical and drastic action of murder. His frustrations, his anger, and his obsession of injustice overcame reason.[7] The victim *8 was a symbolic representative of the class causing the perceived injustices.
In comparing what kind of person Dougan is with other murderers in the scores of death cases that we have reviewed, I note that few of the killers approach having the socially redeeming values of Dougan. In comparison to Dougan's usual constructive practices, this homicide was indeed an aberration. He has made and, if allowed to live, can make meaningful contributions to society.
I ask again the question, is this one of the most aggravated and least mitigated cases reserved for the ultimate penalty of death? When considering the totality of the circumstances, but with compassion for and, hopefully, understanding from the family of the victim, I think not. A life sentence makes this penalty more proportionate to what has existed in emotional or other racially caused homicides.
Such a sentence reduction should aid in an understanding and at least a partial reconciliation of the wounds arising from discordant racial relations that have permeated our society. To a large extent, it was this disease of racial bias and discrimination that infected an otherwise honorable person and contributed to the perpetration of the most horrible of crimes. An approval of the death penalty would exacerbate rather than heal those wounds still affecting a large segment of our society.
Accordingly, I believe that the death penalty should be vacated and that Dougan's sentence should be reduced to life imprisonment without eligibility for parole for twenty-five years from the date of his incarceration for this murder.
SHAW, C.J. and BARKETT, J., concur.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
[2] Barclay v. State, 343 So.2d 1266 (Fla. 1977), cert. denied, 439 U.S. 892, 99 S.Ct. 249, 58 L.Ed.2d 237 (1978); Barclay v. State, 362 So.2d 657 (Fla. 1978); Dougan v. State, 398 So.2d 439 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981); Dougan v. Wainwright, 448 So.2d 1005 (Fla. 1984); Dougan v. State, 470 So.2d 697 (Fla. 1985), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986).
[3] Several issues have been decided adversely to Dougan's contentions: 1) adequacy of instructions on aggravating factors, e.g., Sochor v. State, 580 So.2d 595 (Fla.), cert. granted, ___ U.S. ___, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991); 2) ex post facto application of the cold, calculated, and premeditated aggravating factor, Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982); and 3) diminution of the jurors' sense of responsibility, e.g., Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989).
[4] The remaining issues are: 1) impermissible appeal to racial bias; 2) refusal to grant change of venue; 3) no probable cause for the arrest; and 4) abdication of prosecutorial function.
[5] The State describes the jury's recommendation of death as basically saying "that Mother Theresa would get the death penalty for organizing a plan to go out and kidnap an innocent man, torture him and then twice shoot him in the head."
[6] "Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes." State v. Dixon, 283 So.2d 1, 7 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
[7] To some extent, his emotions were parallel to that of a spouse disenchanted with marriage, full of discord and disharmony which, because of frustration or rejection, culminate in homicide. We seldom uphold a death penalty involving husbands and wives or lovers, yet the emotions of that hate-love circumstance are somewhat akin to those which existed in this case. See, e.g., Ross v. State, 474 So.2d 1170 (Fla. 1985); Blair v. State, 406 So.2d 1103 (Fla. 1981). However, if pecuniary gain is a dominant motive in a spousal homicide, we have upheld it. E.g., Buenoano v. State, 527 So.2d 194 (Fla. 1988); Byrd v. State, 481 So.2d 468 (Fla. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986).