PARIENTE, J.,
concurring.
Dougan’s trial was tainted by the significant Giglio violation committed by the State and his trial counsel’s ineffectiveness and conflict of interest. As a result of these cumulative errors, there can be no confidence in the jury’s verdict of guilt or Dougan’s death sentence. I therefore concur in the unanimous decision of this Court to affirm the trial court’s granting of a new trial.
Undoubtedly, this case involving a 1974 Jacksonville murder conviction is a sad reminder of the turbulent times that existed in Jacksonville at that time. However, while I concur with the unanimous opinion, I would also point out that this Court’s decision to affirm the defendant’s death penalty after his third resentencing was only by a vote of four-to-three. Dougan v. State, 595 So.2d 1 (Fla.1992).
Justice McDonald, joined by Chief Justice Shaw and Justice Barkett, dissented, explaining why Dougan’s sentence should have been reduced to life based on the substantial mitigation related to Dougan’s background. Id. at 6-8 (McDonald, J., dissenting). In that dissent, Justice McDonald recognized that this case was a tragedy on many levels. As Justice McDonald wrote:
Dougan’s mother was white and his father, whom he never knew, was black. After Dougan’s birth, his mother returned to an all white community where she abandoned her son. Although as much white as black, Dougan was rejected by his white relatives and the white population. Ultimately he was adopted by an understanding and compassionate family which also came from a biracial background. An intelligent person, Dougan was well educated and became a leader in the black community, but throughout his life was confronted with a perception of injustice in race relations. Within the black community he was respected. He taught karate and counseled black youths. When blacks were refused service at a lunch counter, he participated in a sit-down strike in defiance of a court order and was held in contempt of court therefor. This was the only blemish, if it can be called one, on his police record until this homicide.
The events of this difficult case occurred in tumultuous times. During the time of the late sixties and early seventies, there was great unrest throughout this country in race relations. Duval County, where this homicide occurred, did not escape and was also a place of such unrest....
The trial judge was aware of everything I have stated. Indeed, he substantially recited these facts in his sentencing order. His final conclusion was that the grossness of the homicide clearly outweighed any other factor or combination thereof which may have lessened the ultimate penalty. The majority agrees, but I cannot.
... This case is not simply a homicide case, it is also a social awareness case. Wrongly, but rightly in the eyes of Dougan, this killing was effectuated to focus attention on a chronic and pervasive illness of racial discrimination and of hurt, sorrow, and rejection. Throughout Dougan’s life his resentment to bias and prejudice festered. His impatience for change, for under *391 standing, for reconciliation matured to taking the illogical and drastic action of murder. His frustrations, his anger, and his obsession of injustice overcame reason. The victim was a symbolic representative of the class causing the perceived injustices.
In comparing what kind of person Dougan is with other murderers in the scores of death cases that we have reviewed, I note that few of the killers approach having the socially redeeming values of Dougan. In comparison to Dougan’s usual constructive practices, this homicide was indeed an aberration. He has made and, if allowed to live, can make meaningful contributions to society.
... A life sentence makes this penalty more proportionate to what has existed in emotional or other racially caused homicides.
Such a sentence reduction should aid in an understanding and at least a partial reconciliation of the wounds arising from discordant racial relations that have permeated our society. To a large extent, it was this disease of racial bias and discrimination that infected an otherwise honorable person and contributed to the perpetration of the most horrible of crimes. An approval of the death penalty would exacerbate rather than heal those wounds still affecting a large segment of our society.
Accordingly, I believe that the death penalty should be vacated and that Dougan’s sentence should be reduced to life imprisonment without eligibility for parole for twenty-five years from the date of his incarceration for this murder.
Id. at 7-8 (footnote omitted).
Clearly, this is a case of many tragedies. It is tragedy for the family of the young man who was murdered. It is a tragedy that over forty years have passed since the murder occurred, of which Dougan has spent most of those years on death row. He now faces a retrial where he may be released from death row or even acquitted. It is a tragedy that Dougan, a young man with so much potential, was possibly involved in this murder that was motivated by racial hatred. It would be overly simplistic, however, to characterize this murder and trial merely as a byproduct of an earlier time when Jacksonville was dealing with deep wounds of past racial discrimination.
At the very least, I agree with the three original dissenters of this Court during Dougan’s appeal of his third resentencing that the death penalty in this case, where the jury vote after his third resentencing was only nine-to-three, should have been reduced to life for Dougan. See id. However, that issue is not before us in this postconviction proceeding. Justice is at times an elusive word, but by granting Dougan a new trial, we restore some small measure of justice to remedy the injustices that occurred at the time of his original trial.