# Supreme Court of Florida

_____

No. SC13-1826
_____

**STATE OF FLORIDA,**
Appellant/Cross-Appellee,

vs.

**JACOB JOHN DOUGAN, JR.,**
Appellee/Cross-Appellant.

[October 20, 2016]

PER CURIAM.

By this opinion, we affirm the postconviction court's granting of a new trial

to defendant Jacob John Dougan, Jr., for a 1974 Jacksonville murder because of

multiple significant problems in his trial, including the false testimony of the key

witness against Dougan, and the actions of his own lawyer who was laboring under

a conflict of interest that adversely affected his performance at trial. This is the

State's appeal of the postconviction order granting a new trial.[1]

_____

1. Because the order concerns postconviction relief from a capital
conviction for which a sentence of death was imposed, this Court has jurisdiction
of the appeal under article V, section 3(b)(1), of the Florida Constitution.
Dougan's motion was filed under Rule 3.850 of the Florida Rules of Criminal

After a lengthy evidentiary hearing, the postconviction court, in a detailed, 239-page order, concluded that the murder conviction and sentence of death should be vacated and a new trial granted on multiple grounds. A key finding was that the State not only failed to disclose the full extent of its plea deal with William Hearn, the State's only eyewitness to the murder, but also allowed Hearn to testify falsely that he was going to receive a life sentence, thus presenting false testimony about the true nature of his deal with the State. Hearn, who was described by the prosecutor in Dougan's trial as the State's key witness, was a participant in the murder, but there is other evidence that could have pointed to Hearn's greater involvement, including that both his gun and his car were used during the crime.

The postconviction court also found that Dougan's guilt phase counsel, Ernest Jackson, was operating under two conflicts of interest due to his solicitation of two of Dougan's codefendants during the guilt phase trial and his extramarital affair with Dougan's sister, a fact unknown to Dougan. In addition, the postconviction court found that ineffective assistance of counsel occurred in the guilt phase, where the postconviction court found that defense counsel "essentially presented no defense," and made unfulfilled promises in opening statement about what would be presented in defense.

---

Procedure because of the date that his conviction became final, rather than under Rule 3.851, which was adopted after his conviction became final.

We conclude that the combined failures of both the State, in violating <u>Giglio v. United States</u>, 405 U.S. 150 (1972), through the testimony of its key witness, and Dougan's counsel, in providing substandard performance, deprived Dougan of a fair and impartial trial.  Accordingly, we affirm the postconviction court's grant of a new trial.

## BACKGROUND

The murder in this case occurred in 1974 and was racially motivated.  The victim, Stephen Orlando, a young white man, was discovered on the morning of June 17, 1974, off a dirt road in Jacksonville Beach.  Near his body, lay a note, which read:

> Warning to the oppressive state.  No longer will your atrocities and brutalizing of black people be unpunished.  The black man is no longer a slave.  The revolution has begun and the oppressed will be victorious.  The revolution will end when we are free.  The Black Revolutionary Army.  All power to the people.

Following the discovery of the victim's body, multiple Jacksonville news channels, police, and the family of the victim received cassette tapes in the mail containing recordings talking about the murder.

After his arrest, Dougan, a twenty-seven-year-old African-American man, was tried in 1975 for the murder in a joint trial with three other African-American defendants:  Elwood Clark Barclay, Dwyne Crittendon, and Brad W. Evans.  The evidence produced at the 1975 guilt phase showed that on the night of Sunday,

June 16, 1974, this group of young men and William Hearn rode around in Hearn's car, seeking to find and kill a white person at random.

Hearn testified for the State and was the only witness to provide an eyewitness account of the killing. Hearn testified that his .22 caliber pistol was the murder weapon and that his car was used by the group of defendants to commit the murder. Hearn stated that shortly before the murder, Dougan wrote out the note that was found by the body and that Dougan was the one directing the others as to what to do. Hearn testified that Barclay stabbed the victim, Dougan shot the victim twice using Hearn's .22 caliber pistol, and Evans and Barclay attempted to stick the note onto the victim's chest using Barclay's pocketknife. The State called three other witnesses—James Mattison, Edredge ("Edred") Black, and Otis Bess, Jr.—who each testified that they were not present on the night of the murder, but that after the murder, on Wednesday, June 19, 1974, and Saturday, June 22, 1974, they were present during the tape-recording sessions. They testified that during those sessions, Dougan made statements taking credit for shooting the victim and wrote down the bulk of what was to be said in the tape recordings.

An FBI agent, who was a handwriting expert, identified Dougan's handwriting on the note that was found by the victim's body. Another expert testified that a .22 caliber pistol that was recovered in Thomas Creek matched the .22 caliber shell casing recovered near the victim's body. Additionally, bullet

fragments recovered from the victim's body originated from a .22 caliber bullet. Another expert identified Dougan's fingerprints on the envelope used to mail the tapes. The medical examiner testified that the victim suffered multiple stab wounds to the stomach, chest, and back, and two bullet wounds to the head.

The four defendants on trial—Dougan, Barclay, Crittendon, and Evans—each testified on his own behalf, denying any involvement in the murder itself. However, they all admitted to participating in the making of tape-recorded confessions days after the murder that were sent to the police, news media outlets, and the victim's family.

At the conclusion of the 1975 guilt phase, Dougan and Barclay were both convicted of first-degree murder, while Evans and Crittendon were convicted of second-degree murder. The jury recommended death for Dougan by a vote of ten-to-two and recommended life for Barclay by a vote of seven-to-five. The trial court imposed a sentence of death for both defendants.

On appeal, this Court affirmed both Dougan's and Barclay's convictions and death sentences. Barclay v. State, 343 So. 2d 1266 (Fla. 1977), cert. denied, 439 U.S. 892 (1978) ("Dougan I"). This Court, then, pursuant to Gardner v. Florida, 430 U.S. 349 (1977),[2] vacated Barclay's and Dougan's death sentences and

_____

2. In Gardner, the United States Supreme Court held that defendants have a right to reliable procedures at the sentencing phase of a capital trial when the trial

- 5 -

remanded the case to the trial court for a <u>Gardner</u> hearing, where the defense would have the opportunity to rebut information contained in the presentence investigation reports. <u>Barclay v. State</u>, 362 So. 2d 657, 658 (Fla. 1978) ("<u>Dougan II</u>"). After the <u>Gardner</u> hearing, the trial court reimposed Dougan's death sentence, and this Court affirmed. <u>Dougan v. State</u>, 398 So. 2d 439, 441 (Fla. 1981), <u>cert. denied</u>, 454 U.S. 882 (1981) ("<u>Dougan III</u>").

After Dougan lost the appeal, he filed a petition for writ of habeas corpus, alleging that his appellate counsel, Ernest Jackson, who had also represented Barclay and Crittendon in their appeals, failed to provide effective assistance of counsel. <u>Dougan v. Wainwright</u>, 448 So. 2d 1005 (Fla. 1984) ("<u>Dougan IV</u>"). This Court held that Dougan's appellate counsel, Jackson, who had also been Dougan's trial counsel, failed to provide effective assistance due to a conflict of interest in representing the other codefendants, and also failed to raise meritorious claims, even though Dougan appeared to have been his primary client on appeal. <u>Id.</u> at 1006.[3] As a result, this Court granted Dougan's petition for habeas corpus and granted him a new appeal. <u>Id.</u>

_____

judge relies in part on confidential information not disclosed to the defendant or his counsel to impose a death sentence. 430 U.S. at 358.

3. By the time that this Court had considered this habeas petition, it had already granted Barclay a new appeal for the same reason—that appellate counsel had a conflict of interest in representing both Barclay and Dougan. <u>Barclay v. Wainwright</u>, 444 So. 2d 956, 958 (Fla. 1984). Eventually, Barclay received a life

In the new appeal, this Court determined that Dougan was entitled to a new sentencing proceeding because the State had been permitted to read an indictment for another murder of which Dougan had not been convicted into the record over objection. Dougan v. State, 470 So. 2d 697, 701-02 (Fla. 1985). Dougan's next and latest sentencing proceeding began on September 17, 1987, at the conclusion of which, the jury recommended by a vote of nine-to-three to again sentence Dougan to death. Dougan v. State, 595 So. 2d 1, 3 (Fla. 1992). Again, the trial court sentenced Dougan to death. Id. On appeal, this Court affirmed the sentence. Id. at 6.

Justice McDonald, joined by Chief Justice Shaw and Justice Barkett, dissented, explaining that he believed that Dougan's sentence should have been reduced to life based on the substantial mitigation related to Dougan's background. Id. at 6-8 (McDonald, J., dissenting).

Because two of the codefendants had been convicted of second-degree murder and Barclay received a life sentence from this Court, Dougan became the sole defendant of this group of defendants implicated in the victim's murder to remain on death row.

---

sentence by this Court as a result of the jury's recommendation of life. Barclay v. State, 470 So. 2d 691, 695-96 (Fla. 1985).

## Postconviction Proceedings

The postconviction proceedings in this case have been protracted, lasting over twenty years, and have included a series of public records disputes. Different circuit court judges presided over these proceedings, until eventually Judge Jean M. Johnson was assigned and presided over the final evidentiary hearing. In his amended postconviction motion, Dougan raised twenty-nine separate claims, some of which were divided into multiple subclaims.[4] After the postconviction

---

4. The claims contained in Dougan's amended postconviction motion and the postconviction court's determination as to the merits of each claim are as follows: I: State withheld exculpatory evidence about cash payments made to William Hearn, Otis Bess, Eldred Black, and James Wade Mattison in exchange for testimony (denied); II: Death is not the appropriate punishment and State's refusal to accept punishment less than death establishes that the penalty was imposed in an arbitrary and discriminatory manner (denied); III: State withheld extent of its plea agreement with key witness, William Hearn, violating Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963) (granted on both grounds); IV: State withheld exculpatory evidence about Mr. Hearn's January 1975 statements to law enforcement officers (denied); V: State failed to disclose exculpatory evidence regarding the infiltration and/or surveillance of the Black Karate School by law enforcement officers who incited the members to break the law, participate in violent and illegal acts, and provoke the actions in this case (denied); VI: Juror exposure and consideration of improper, inaccurate, and inflammatory information violated his constitutional rights, and Florida Rule of Criminal Procedure 3.575 and Rule Regulating The Florida Bar 4-3.5(d)(4) precluding juror interviews are unconstitutional (denied); VII: There was insufficient evidence to convict Dougan of felony murder (denied); VIII: Error occurred when his trial was not severed from that of his codefendants (denied); IX: The atmosphere at trial combined to prejudice his right to a fair trial in violation of the Sixth and Fourteenth Amendments (denied); X: Jury instructions relieved the State of its burden to prove Dougan's guilt beyond a reasonable doubt (denied); XI: Ineffective assistance of guilt phase counsel based on two conflicts of interest and other act and omissions (multipart claim) (granted on the basis of the conflicts

- 8 -

evidentiary hearing held on February 25-28, 2013, the postconviction court granted

relief in a thorough and lengthy order as to multiple claims. Specifically, relief

was granted as to claim III, which involved both the <u>Giglio</u> claim regarding

Hearn's testimony about his plea agreement and the related <u>Brady</u> claim regarding

of interest and counsel's failure to investigate and prepare how to present a defense to the charges); XII: Trial counsel acted unreasonably by allowing defendant to testify without bolstering his testimony with character evidence (denied); XIII: Sentencing judge failed to consider or set forth in writing mitigating evidence (denied); XIV: State and sentencing judge engaged in ex parte communications and did not disclose to Defendant or counsel that the State prepared the written findings supporting the death sentence (denied); XV: Dougan's sentence must be vacated under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), (denied); XVI: Dougan was absent from many proceedings without waiving his right to be present, the public was excluded from some proceedings, and many proceedings were not transcribed (denied); XVII: Applying the kidnapping aggravator was error because insufficient evidence existed to support the aggravator, and the jury instructions were inadequate (denied); XVIII: Ineffective assistance of resentencing counsel (multipart claim) (granted on the basis of resentencing counsel's failure to properly cross-examine and rebut the testimony of the medical examiner); XIX: Trial counsel erred when he failed to have Dougan evaluated by a mental health expert (denied); XX: Dougan was tried while incompetent (denied); XXI: The State's treatment of the victim's manner of death violated Dougan's Sixth, Eighth, and Fourteenth Amendment rights (denied); XXII: The State withheld exculpatory evidence and/or counsel was ineffective for failing to present this evidence (denied); XXIII: Dougan's death sentence is cruel, unusual, inhuman, and degrading (denied); XXIV: The Fourth Circuit seeks the death penalty based upon racial considerations (denied); XXV: The Grand Jury and jury were selected in a discriminatory manner (denied); XXVI: During jury selection, the State exercised peremptory challenges in a racially and gender discriminatory manner at both the original trial and resentencing (denied); XXVII: Dougan's right to be free from all forms of racial discrimination was violated (denied); XXVIII: Florida's treatment of Dougan violates treaties to which the United States, and thus Florida, is a party (denied); XXIX: Dougan's conviction and death sentence violate international law (denied).

the State's nondisclosure of said plea agreement; claim XI, as to the subclaims of guilt phase counsel's conflict of interest and guilt phase counsel's failure to prepare and present a defense to the charges; and claim XVIII, as to the subclaim that resentencing counsel performed ineffectively for failing to cross-examine and rebut the testimony of the medical examiner whose testimony was presented to support the aggravating factor that the crime was especially heinous, atrocious, and cruel. However, the postconviction court denied relief with respect to all of Dougan's other claims.[5]

We address the postconviction court's conclusions as to the guilt phase claims, and because we conclude that Dougan is entitled to relief on those claims, we do not need to address the postconviction court's findings regarding ineffectiveness of counsel in the penalty phase upon resentencing. For the same reason, we also do not address any of Dougan's cross-appeal claims.

With respect to the claim that the State knowingly allowed Hearn to falsely testify regarding the full extent of his plea deal, the postconviction court found:

> Mr. Hearn testified at trial that he was going to get a life sentence. At his sentencing, the State recommended Mr. Hearn receive a fifteen-year sentence. The State's letters written to the parole board on Mr. Hearn's behalf were impactful in Mr. Hearn's

_____

5. When the United States Supreme Court issued its opinion in Hurst v. Florida, 136 S. Ct. 616 (2016), we ordered supplemental briefing to address the impact of that decision on this case. However, because we are reversing for a new penalty phase based on other issues, we need not address this issue.

early release from incarceration.  Without the letters written by the State, it is doubtful Mr. Hearn would have been released after serving only approximately five years of his fifteen-year sentence.  This Court interprets the State's acts in writing these letters on behalf of Mr. Hearn, which began the day he was sentenced, to reflect the State or Mr. Hearn expected he would receive a more lenient sentence for his testimony, which was not accurately represented to the jury at Defendant's trial.  Mr. Hearn did not receive the deal he testified at trial that he would receive.  Judge Bowden testified at the hearing that the plea was straight up—that Mr. Hearn's sentence was at the mercy of the State and judge.  Mr. Hearn's sentencing was continued from prior to the day he testified at Defendant's trial until after he had given his testimony against Defendant.  The jury was not aware of the facts that may have motivated Mr. Hearn's testimony at Defendant's trial.  Based on a review of the record and the evidentiary hearing testimony of Judge Bowden, the statement by Mr. Hearn at trial that he would receive a sentence of life was not true.  Mr. Hearn's lack of truthfulness in his testimony regarding the sentence he was going to receive calls the credibility of his testimony as a whole into doubt. Mr. Hearn was the State's key witness at Defendant's 1987 resentencing, but the record and evidence presented suggest more in favor of the State having knowledge prior to his testimony that Mr. Hearn was hostile to the State.  This information could have contributed to Mr. Hearn's motivation to testify at Defendant's resentencing, of which the jury should have been made aware.

As a result of these findings, the postconviction court granted Dougan relief on this claim.

As to the claims of trial counsel's conflicts of interest, the postconviction court found that Dougan's trial counsel, Ernest Jackson, had a romantic relationship with Dougan's sister and tied this conflict of interest to Jackson's—a privately retained defense lawyer—failure to properly defend Dougan:

The Florida Supreme Court, in Barclay, 444 So. 2d at 958-59, stated the money counsel received for his representation at trial and on

appeal "apparently" came from Defendant's father. Mr. Barclay's Petition for Writ of Habeas Corpus to the Florida Supreme Court in 1983 mentions Mr. Jackson's fees were paid by Defendant's father, and states it was a fact unknown even to his then partner, Ms. [Deitra] Micks. The 1983 petition filed on behalf of Mr. Barclay includes an affidavit of Defendant's father that states he paid Mr. Jackson approximately $3000 for the representation of his son, which he attested represented only a fraction of the total legal fees incurred on his son's account. In a letter to Ms. Micks from Mr. Barclay's counsel for the aforementioned petition, it asks about any record of a bill Mr. Jackson may have sent to Mr. Dougan, Sr., regarding payment. The letter indicates Mr. Dougan, Sr., stated to Mr. Barclay's counsel he paid Mr. Jackson $3000 in part payment of his bill, but did not have any record of this. Mr. Barclay's counsel further states in the letter, "thus I don't know when the payment was made. It might have been after the trial I suppose."

The postconviction court reasoned that Jackson's relationship with Dougan's sister, Thelma Turner, was disruptive to Jackson's law practice and affected Jackson's preparation of Dougan's case:

> While evidence was presented Defendant's sister refused to testify for her brother at his resentencing, it is unclear as to whether this same hostility was present at Defendant's trial. Although testimony demonstrated Ms. Turner attended Defendant's trial and that she was with Mr. Jackson during breaks in the proceedings, it is not clear as to the reason she did not testify at trial. The record does reflect Defendant's father was the only member of his family to testify on his behalf during the proceedings. The record indicates Mr. Jackson did not provide testimony or evidence at trial of Defendant's mother's alcoholism or his father's philandering, which Defendant claims had an adverse effect on him while growing up in the Dougan home. Mr. Jackson's relationship with Ms. Turner suggests conflict as a reason for not presenting this evidence and testimony on behalf of Defendant at his proceedings. As to Defendant's claim that Mr. Jackson failed to pursue plea negotiations with the State because of Ms. Turner's aversion to being affiliated with someone who might have committed murder and his conflict in marrying the sister of an

- 12 -

innocent man or pursuing a plea and marrying the sister of a man [who] had ple[d] guilty to murder, the record does not reflect Mr. Jackson considered or pursued plea negotiations.

The postconviction court also found that Dougan's trial counsel had a conflict of interest because of his solicitation of the appellate representation of Dougan's codefendants during the course of the joint trial:

> Defendant's trial counsel did not mention the names or question Defendant concerning the involvement of his co-defendants, although Defendant testified he participated in making some of the tape recordings and indicated he got some of the information about the murder used in the tapes from James Mattison. Defendant's trial counsel did examine Mr. Mattison, who testified for the State about his involvement in making tape recordings with Defendant and the co-defendants, which were used as evidence against them. But in his examination of Mr. Mattison, Mr. Jackson did not raise the names of the co-defendants or attempt to distinguish Defendant's involvement from that of the co-defendants. Although Mr. Barclay and Mr. Crittendon testified at trial about Defendant's involvement in making the tape recordings and identified Defendant's voice on the recordings, Defendant's trial counsel did not question them or attempt to distinguish Defendant's involvement; but actually aligned Defendant's involvement with that of Mr. Crittendon during closing.

(Footnote omitted.)

Finally, the postconviction court described trial counsel's conduct:

> During his closing, trial counsel argued the note found on the Victim's body could not be identified as the note presented in evidence; the State was unable to fix for certain the Victim's time of death; the State did not preserve the pistol for fingerprints; that no fingerprints were found on the note; and that the tape recordings made were a result of Defendant's imagination. In trying to make his distinction between the content of the tape recordings Defendant made and the manner in which the Victim's body was found, Mr. Jackson focused the jury's attention to photographs of the Victim's deceased

body and told them to "Look for blood." Mr. Jackson presented argument as to the reliability of Mr. Hearn's statement because he made a deal with the State. Trial counsel further questioned the location of the cartridge found at the scene as compared to Mr. Hearn's testimony; why Defendant would use Mr. Hearn's gun for the killing when Defendant had a larger, .32 gun. Mr. Jackson also questioned why Mr. Hearn would leave his gun in town before leaving Florida, because "[g]enerally people carry guns when they go out of town."

While trial counsel presented testimony from Defendant and his father that Defendant was home at the time of the murder, he did not attempt to corroborate this testimony by a disinterested source or evidence. With the exception of the testimony of Defendant and Mr. Dougan, Sr., trial counsel claimed surprise as to the testimony of the witnesses he called on Defendant's behalf; tried to impeach his own witness, which the court denied; and presented testimony that was contrary to his stated theory of defense. After indicating surprise at the statements of several witnesses in a row, the court asked Mr. Jackson if he had "talked to these witnesses since the deposition was taken." In response, Mr. Jackson stated he had, to which the court reiterated, "You mean you've talked to them since the deposition?" Mr. Jackson replied, "This morning. This morning, yes, sir."

Concluding that "[t]rial counsel essentially presented no defense," the postconviction court cited these examples as specific acts and omissions outside the range of professional conduct as to overcome the presumption of sound trial strategy.

**Postconviction Evidentiary Hearing Pertinent to <u>Giglio</u> Claim**

At the postconviction evidentiary hearing,[6] in support of his <u>Giglio</u>/<u>Brady</u> claim, Dougan presented the testimony of William Hearn, who was the State's

---

6. The postconviction court stated in its order that Dougan had failed to demonstrate the existence of an additional agreement between Hearn and the State,

witness at the trial; Aaron Bowden, who was the Assistant State Attorney who prosecuted Dougan in 1975 and approached Hearn to negotiate a plea bargain;[7] Robert Link, Dougan's 1987 resentencing counsel; William Sheppard, a criminal defense attorney; Stephen Kunz, a former Assistant State Attorney who coprosecuted Dougan's 1987 resentencing; Dwyne Crittendon, Dougan's codefendant; Elwood Clark Barclay, another codefendant; Dr. George W. Woods, a psychiatrist hired by postconviction counsel; and Donald Allen Carter, who had prepared the 1975 presentence investigation (PSI) report on Hearn.[8]  In addition, Dougan introduced several documents, as described below.

One of the documents Dougan introduced was the transcript of the deposition of William Hearn taken on January 31, 1975, prior to the 1975 trial. This transcript reflects that Hearn was asked questions about his plea for the murder of the victim in this case:

but the postconviction court nevertheless considered this claim at the evidentiary hearing "[o]ut of an abundance of caution."  If there is any doubt whether the movant has made a facially sufficient claim, this Court presumes that an evidentiary hearing is required.  Jackson v. State, 147 So. 3d 469, 485 (Fla. 2014) (quoting Walker v. State, 88 So. 3d 128, 135 (Fla. 2012)).

7. Aaron Bowden subsequently became a circuit court judge, but we refer to him as Bowden rather than as Judge Bowden, not out of disrespect but to ensure there is no confusion that his testimony was based on his involvement in this case as an Assistant State Attorney.

8. The State Attorney at the time of Dougan's trial was Ed Austin, but he was deceased by the time of the postconviction evidentiary hearing.

Q:  Did anybody from the Prosecutor's office say that they would recommend a certain number of years for you to go to prison?
A:  Yes.
Q:  How many years?
A:  Life sentence.
Q:  Life sentence. And that was in exchange for what, your pleading guilty?
A:  Yes.
Q:  Do you feel that that is a bargain?
A:  Yes.
Q:  Why?
A:  Because, first degree carries the death penalty, and also you are not eligible for parole until twenty-five years later.

(Emphasis added.)

At the postconviction evidentiary hearing, Bowden testified that prior to Dougan's trial, he and the State's investigator, Tommy Reeves, approached Hearn, who Bowden described as "critical" to the case, and negotiated a bargain for second-degree murder in exchange for truthful testimony.  This deal, he said, was "straight up," and at the mercy of the State Attorney and the judge.  He further testified that Hearn was the least culpable although he was involved in two homicides, was the driver of the vehicle used in Orlando's murder, his vehicle was used in both offenses, and he was shot in the foot in one of the offenses.  Bowden also testified at the postconviction hearing that after Hearn was sentenced to fifteen years, Hearn seemed disappointed because his lawyer had bargained heavily for five years, but the State rejected it.

Dougan also introduced Hearn's testimony at Dougan's guilt phase trial, which was taken on February 28, 1975. During direct examination by Bowden, Hearn testified that he pleaded to second-degree murder for the death of the victim. Hearn testified on cross-examination that he read the depositions of Otis Bess, James Mattison, and Edred Black before Hearn made his deal with the State to plead to second-degree murder. He testified that he pleaded guilty in January 1975, and he was scheduled to be sentenced on February 28 (that day) but had not yet been sentenced. When cross-examined by Barry Sinoff, who was Evans' attorney, he testified that he understood that a life sentence under a first-degree murder conviction involved parole eligibility after approximately twenty-five years,[9] whereas, he understood a life sentence under a second-degree murder conviction to involve eligibility for parole "a little earlier," yet not "at any time."

On redirect examination, Bowden asked Hearn, "Mr. Hearn, what sentence do you expect to get?" Hearn responded, "Life." Then, on recross examination, Sinoff asked again about Hearn's potential sentence:

> Q: Mr. Hearn, you said in answer to Mr. Bowden's question that you thought you would get a life sentence but your sentencing has been postponed past today, of course, until after your testimony here

---

9. At the time of the 1975 trial, a first-degree murder charge carried a sentence of life without the possibility for parole for twenty-five years. § 775.082, Fla. Stat. (1975). This provision was subsequently amended to remove the possibility for parole after twenty-five years for a conviction of murder in the first degree. See ch. 94-228, § 1, Laws of Fla. (1994); § 775.082(1), Fla. Stat. (1994).

today. Do you realize you could get anywhere from zero to life, don't you? You could get one year, two years, whatever?
        A: Yes.

Thus, it is clear that Hearn testified to the jury that while it was possible he could receive a term-of-years sentence, his deal with the State was for a life sentence under a second-degree murder conviction.

Donald Allen Carter prepared the PSI report for Hearn. In the Hearn PSI, Carter noted that he interviewed Hearn on January 29, 1975, and wrote:

> Mr. Aaron Bowden, Assistant State Attorney, said that he plans to recommend a life sentence for the defendant, but that he is not inflexible regarding a sentence. Mr. Bowden said that should the Court see fit to impose a lesser penalty, he would not object. Mr. Bowden feels that [Hearn] has been completely honest and very cooperative.

(Emphasis added.)

Dougan also introduced the transcript of Hearn's deposition for another murder case, involving a victim named Stephen Roberts, which was taken after the guilt phase in this case, on March 21, 1975.[10] In that deposition, Hearn was asked about the Roberts murder, and testified that Bowden told him that in exchange for

---

10. The defendants, including Dougan, were implicated in this separate murder of Stephen Roberts, which occurred around the same time period as the murder. Dougan was indicted for the Roberts murder, even though he was, according to the postconviction court, not present for that murder.

his cooperation, he would be able to plead to second-degree murder for the murder of the victim in this case, and the charges in the Roberts case would be dropped.

Dougan introduced the State's closing argument from the first penalty phase which occurred in April 1975 and resulted in a jury recommendation for death of ten-to-two. In closing argument, Bowden called Hearn and the State's other witnesses, Black, Bess, and Mattison, "scoundrel[s]." He stated that "William Hearn is worse than that; he's confessed murder . . . . [T]he State of Florida does not have the luxury of always having someone there observing the crime." However, Bowden stated, "We believe that you should know what happened to the best of our ability . . . . William Hearn was the one person who was able to give you that testimony." (Emphasis added.)

Subsequent to Dougan being sentenced to death for the murder of the victim, Judge Olliff sentenced Hearn on June 10, 1975, for his second-degree murder conviction for the death of the victim. During the sentencing proceeding, Bowden stated that "Mr. Hearn testified at the trial of the cause in my judgment completely and truthfully as to all matters that he had participated in." He also indicated that "I state with absolute certainty that without the testimony of William Hearn the State could not have achieved the results that were achieved in the trial before this Court." (Emphasis added.)

When asked what his recommendation was, Bowden prefaced it:

Mr. Reeves and Mr. Owens and I have had contact with William Hearn, sometimes on a daily basis, sometimes for hours at a time . . . and over a period of some months I have been able to observe William Hearn as I have not been able to observe any defendant before . . . . He did not strike me as a hard individual; he did not strike me as a militant individual. On the contrary, he strikes me today as a gentleman. He strikes me as a person who is remorseful; he strikes me as a person that is interested in bettering himself.

. . . .

Your Honor will recall that when Mr. Dempsey and I first talked to Your Honor in the early stages of this proceeding the agreement was at the time and it was tentative indeed that William Hearn should receive a term of life imprisonment. Now, that was open in the sense that his testimony—his appearance as a witness could change that to this extent, it could actually increase his jeopardy before the Court if he gave false testimony or did not cooperate.

. . . .

. . . [I]t is my position, may it please the Court, that William Hearn is deserving of a considerable amount of leniency from this Court, Your Honor, not because he is a nice guy, not because he has got relatives that care about him, not because he happens to be a pleasant looking personable young man, but for the basic fundamental reason, as [Y]our Honor well knows having once been a prosecutor, that he cooperated and testified for the State of Florida.

Bowden then recommended a sentence of a term of fifteen years in prison, and stated that "my recommendations are, in fact, the recommendations of [State Attorney] Mr. [Ed] Austin. We have discussed this recommendation at some length." Judge Olliff stated that, after reading the PSI, he was "inclined to follow the recommendation of Mr. Bowden although [they] had tentatively, previously, with counsel, discussed another sentence." Further, Judge Olliff stated, "I am

- 20 -

going to follow the recommendation for the reasons just stated by Mr. Bowden and also for the reason that this is a good PSI." Judge Olliff then sentenced Hearn to fifteen years in prison.

William Sheppard, a criminal defense attorney with experience practicing before Judge Olliff, testified at the postconviction hearing that Judge Olliff normally used a "Form Four." The "Form Four" was Judge Olliff's written form plea agreement that advises the defendant of his or her rights. Sheppard stated he would be surprised if a complete file of a case with a plea lacked the form. As the postconviction court wrote, "[a]lthough his court file includes all of the other documents recorded in the clerk's chronological notation of progress in Mr. Hearn's case, there is no plea agreement in the file." Sheppard also testified that he prepared a memorandum memorializing a conversation he had with Dempsey in 1993, during which Dempsey had told him that he had felt that "Judge Olliff had screwed his client by giving him 15 years."[11]

The postconviction court also considered Hearn's classification and admission summary dated June 16, 1975, in which the prison evaluator wrote that

---

11. Upon review of the record, to the extent the postconviction court relied upon it, the statement by Mr. Dempsey to Mr. Sheppard in 1993 that "Judge Olliff had screwed his client by giving him 15 years" is inadmissible hearsay, and therefore, this Court does not consider that statement as part of our analysis.

it was his " 'personal' opinion that the subject is more involved in the offense than what other sources, including newspaper articles, seem to indicate."[12]

At the evidentiary hearing, postconviction counsel introduced correspondence and memoranda concerning an early release for Hearn. These items included a June 10, 1975—the day Hearn was sentenced—letter from then-Assistant State Attorney Bowden to the Department of Health and Rehabilitative Services, in which Bowden recommended that Hearn be incarcerated at a particular facility out of fear for his safety if he were incarcerated in the same location as those against whom he testified. Also introduced were multiple letters dated from August 5, 1975, to May 10, 1979, from Austin and Bowden to chairmen of the Florida Parole and Probation Commission, urging for Hearn's early release and stating that Austin had a commitment to Hearn and his attorney. There were also multiple memoranda and an interoffice communication reflecting that in addition to the written correspondence, the prosecutors spoke with the chairmen regarding Hearn on more than one occasion. On a January 6, 1976, memorandum, Austin

---

12. Dr. George W. Woods, Jr., also testified at the postconviction hearing regarding a June 14, 1976, psychiatric evaluation report made by Dr. Delfina Johnson, a psychiatrist at a correctional institution, in which Dr. Johnson indicated the diagnostic impressions of personality disorder and antisocial disorder and that Hearn's judgment was "impaired."

handwrote that Hearn "gave the State two electric chair cases and two 199-year cases."[13]

On March 20, 1979, the General Counsel of the Florida Parole and Probation Commission sent letters to Hearn denying Hearn's own requests for a review of his presumptive release date. After the March 20, 1979, letter from the General Counsel, Hearn sent another request, stating that he received copies of letters sent by Austin, Bowden, Judge Olliff, and his attorney, Mr. Dempsey. The General Counsel wrote back on April 17, 1979, stating that Hearn's latest request stated no more cause for review than his previous requests. A month later, on May 17, 1979, the chairmen responded to a letter from Austin, dated May 10, 1979, stating that the letter will be included in Hearn's file for future reference. The June 20, 1979, institutional progress review of Hearn noted that Hearn failed to become involved in recommended rehabilitative programs, and the team recommended Hearn to remain in medium custody for a further period of observation, and that he get psychological counseling to "restructure his outlook on his fellow man." Despite this recommendation, on August 29, 1979, Hearn was granted an early release date

---

13. At the time he wrote this comment, Mr. Austin was presumably referring to Dougan's and Barclay's death sentences, the latter of which was eventually vacated to a life sentence by this Court, and Evans' and Crittendon's 199-year sentences. See Barclay, 470 So. 2d at 695-96 (vacating Barclay's death sentence and imposing a sentence of life in prison).

of September 11, 1979. In total, Hearn served less than five years in prison. His parole was then terminated in 1985.

Prior to Dougan's 1987 resentencing, on August 4, 1987, Stephen Kunz, the Assistant State Attorney at the 1987 resentencing, wrote a memorandum to Austin with information about the case and a list of reasons for and against seeking the death penalty. Among the reasons not to seek the death penalty, the memorandum provides, "Key witness William Hearn is now hostile to the State of Florida and cannot be expected to assist the State in proving certain aggravating circumstances during the penalty proceeding." (Emphasis added.) At the postconviction hearing, when asked about this statement, Kunz testified that his use of the term "hostile" in the memorandum may have been intended to indicate that Hearn was "reluctant to come in and testify again" or get involved any further. During his testimony, Kunz confirmed that he believed Hearn was a very important witness, and that "[the State] could not have had the success [it] had in this case without the testimony of Mr. Hearn."

At the postconviction hearing, Hearn testified that he never told anyone he was "hostile" before the 1987 resentencing, but rather that he did not want to testify again. Robert Link, resentencing counsel, also testified at the postconviction hearing, stating that he had not received, viewed, or been told about the 1987 memorandum referring to Hearn as "hostile to the State." However,

when Hearn actually did testify at the 1987 resentencing, Hearn did not appear hostile and answered all the questions asked of him. At the 1987 resentencing, Hearn also testified that he received fifteen years' imprisonment under the second-degree murder conviction, but only served less than five years, and that the State Attorney wrote letters to the parole board on his behalf.

The postconviction court's order described Hearn's testimony at the 1987 resentencing:

> At the 1987 resentencing, Mr. Link asked Mr. Hearn if he knew at the time he entered his plea, that for second-degree murder he could get anything from probation to a life sentence, to which he replied in the affirmative. Mr. Hearn was then asked if he knew he was eligible for parole immediately on any sentence he got for second-degree murder, and stated, "I didn't know that." Mr. Link then asked Mr. Hearn what the difference was, as he understood it at the time he entered his plea, between a sentence he could receive, even a life sentence for second-degree murder, and a life sentence for first-degree murder. Mr. Hearn responded that first-degree murder had a mandatory twenty-five years, and that for second-degree murder, one is "eligible for parole on X amount of years."

## ANALYSIS

### I. Giglio

As to Dougan's Giglio claim, the State argues that the postconviction court erred in finding that the State's key witness, William Hearn, gave false testimony regarding the full agreement he made with the State and that the State never corrected Hearn's testimony or disclosed the full nature of the agreement. The

State also argues that the claim is barred by res judicata, and that the postconviction court confused the Giglio and Brady standards.

**Standard**

To establish a claim for relief under Giglio, the defendant must demonstrate that (1) the prosecutor either presented or failed to correct false testimony, (2) the prosecutor knew the testimony was false, and (3) the evidence was material. Jones v. State, 998 So. 2d 573, 580 (Fla. 2008). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. Green v. State, 975 So. 2d 1090, 1106 (Fla. 2008). Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id.; see also Guzman v. State, 868 So. 2d 498, 506 (Fla. 2003).

The standard applied under the third prong of the Giglio test has been described as being more "defense-friendly" than the Brady standard. Guzman, 868 So. 2d at 507 & n.10, 12 (citing United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995)). The reason for this characterization is that once the defendant establishes that the State knowingly presented false testimony, the burden is on the State to prove beyond a reasonable doubt that the knowing use of the false testimony, or failure to disclose the false testimony once it was discovered, did not affect the verdict. Guzman v. State, 941 So. 2d 1045, 1050-51 (Fla. 2006).

## Standard of Review

Giglio claims present mixed questions of law and fact. Wickham v. State, 124 So. 3d 841, 852 (Fla. 2013). Thus, this Court applies a mixed standard of review. As to factual findings made by the trial judge, the Court defers to the factual findings if supported by competent, substantial evidence. Id. However, the Court independently reviews the application of the law to the facts. Id.

## Application

As a threshold matter, the State argues that the postconviction court has confused the Giglio and Brady standards in addressing this claim. The Brady standard requires the defendant to demonstrate that the State willfully or inadvertently suppressed material exculpatory or impeaching evidence. Mungin v. State, 79 So. 3d 726, 734 (Fla. 2011). We disagree that the postconviction court confused or misapplied the standards.

Dougan's claim relates to a witness's allegedly false testimony that the State failed to correct, and also a claim that the State failed to inform the defendant of the true nature of the witness's plea deal, which was the basis of the false testimony. The claim was addressed below as a Giglio and Brady claim, and the State addressed it as such in its post-evidentiary hearing memorandum. This Court has addressed claims that implicate both Giglio and Brady and has conducted an analysis under both tests. See, e.g., Wyatt v. State, 71 So. 3d 86, 105-07 (Fla.

2011); <u>Davis v. State</u>, 928 So. 2d 1089, 1115-16 (Fla. 2005); <u>Mordenti v. State</u>, 894 So. 2d 161, 168-75 (Fla. 2004). Thus, we reject this argument. However, although we disagree that the postconviction court confused the standards, <u>Giglio</u> is sufficient to warrant relief for this claim due to the focus on Hearn's trial testimony and the nature of the agreement as a contingent agreement, rather than a formalized agreement for a set sentence.

Next, the State argues that the claim is barred by res judicata because this Court addressed a similar claim in <u>Dougan I</u>, and Dougan could have raised this claim on direct appeal. The State raises this argument for the first time in its Reply Brief in this Court, so it is waived. <u>See</u> <u>Franqui v. State</u>, 965 So. 2d 22, 32 (Fla. 2007) (rejecting arguments raised for the first time on appeal to this Court as procedurally barred). The State could have raised this argument in its response to Dougan's amended postconviction motion, and need not have waited until submitting its Reply Brief in this Court.

Even if the argument were not waived, it lacks merit. A reading of <u>Dougan I</u> and the record makes clear that the previous claim addressed only the part of Hearn's deal relating to his accountability for a second murder—the murder of Stephen Roberts—and that the State dropped those charges against Hearn. Dougan's defense counsel at the 1975 penalty phase argued that the State withheld the full extent of the agreement between Hearn and the State in that Hearn

"escaped any punishment whatsoever under the Roberts case."  On direct appeal,

defense counsel argued that the State did not disclose that the charges in the

Roberts case would be dismissed.  This Court quoted the prosecutor's explanation

for why Hearn could not have testified about the "second murder," in the direct

appeal decision addressing the claim.  See Dougan I, 343 So. 2d at 1270.  On the

other hand, Dougan's present claim relates to what Hearn would receive for

testifying in this case—involving the murder of Stephen Orlando—specifically, the

sentence he would receive for his second-degree murder conviction.  Thus, even if

the claim was not waived, we reject the State's argument that this claim is barred

under the principles of res judicata.

## Competent, Substantial Evidence

In order for there to have been a Giglio violation, there must have been a

deal or agreement different than the one to which Hearn testified.  After a review

of the record, the postconviction court's determination that the State violated

Giglio is supported by competent, substantial evidence.  Hearn testified that his

deal was for second-degree murder for which he would receive a life sentence.

The record and postconviction testimony reveal that this was not the actual deal.

In reality, the deal was a "straight up" second-degree murder plea where the

sentence was at the State's mercy, contingent upon the outcome of Dougan's trial.

This came directly from Bowden's postconviction testimony.  Hearn's testimony to

the contrary was never corrected at trial, and the guilt phase jury heard that Hearn's deal was that he would be sentenced to life in prison.

The State attempts to refute the postconviction court's findings by pointing to various cases to argue that post-testimony efforts on the part of the State to help a cooperating witness do not, in themselves, prove the existence of a previous deal between the State and a witness. However, those cases are distinguishable from the present case.

For instance, the State relies upon Hurst v. State, 18 So. 3d 975, 990-92 (Fla. 2009) ("Hurst v. State"), in which this Court affirmed the denial of a Brady/Giglio claim. In Hurst v. State, the witness testified that the prosecutor told him that he would "take care of" the witness if he testified, and the witness interpreted that to mean that he would get leniency, which he did not end up receiving. Id. at 991. The prosecutor testified at the postconviction hearing that he only meant that he would keep him separated from the defendant and other inmates. Id. The postconviction court determined that "the State did not fail to disclose any promises made to [the witness] in violation of Brady because the court found, based on the testimony of [the prosecutor], that no promises were made." Id. The postconviction court also determined that there were no promises of leniency made to the witness and denied a Giglio claim. Id. at 991-92. Both conclusions involved credibility determinations that this Court would not second-guess. Id. at 992.

Hurst v. State does not support the State's argument because the evidence in that case did not show that the witness was promised leniency, and the assistance from the prosecutor in Hurst v. State was only to keep the witness away from the defendant. Here, the evidence suggests that the deal was for potentially significant leniency if Hearn testified in a manner that was helpful to the State.

The State also cites Shellito v. State, 121 So. 3d 445, 459-60 (Fla. 2013), in support of its position. In Shellito, a witness testified at the defendant's trial that it was his understanding that "his maximum possible penalty was life imprisonment in his armed robbery case," that he was not promised anything for his testimony, and that he understood he could also receive a fifteen-year minimum mandatory sentence. Id. at 460. However, by the time the witness testified, the State filed a withdrawal notice of its intent to prosecute the witness as a habitual offender, and the defendant argued that it was false testimony that the witness was not receiving a benefit from his testimony. Id. at 459-60.

Shellito is different from the present case because there, this Court determined the witness did not testify falsely regarding the promise because the evidentiary hearing was devoid of evidence of a benefit in consideration of the witness's testimony. Id. However, the Court determined that the witness did testify falsely regarding the fifteen-year mandatory minimum, but determined there was no reasonable likelihood that this false testimony could have affected the

guilty verdict.  Id.  Also, the defendant in Shellito testified that life was the maximum possible sentence he could receive.  Id. at 460.

Here, on the other hand, Hearn testified at trial that he was going to get a life sentence, and the evidentiary hearing was not devoid of evidence that the deal was actually indeterminate depending on Hearn's cooperation and the outcome of the case.  The evidence included the actual recommendation of fifteen years at Hearn's sentencing, Judge Bowden's postconviction testimony that the deal was at the "mercy" of the State and the judge, and the prosecutors' efforts to get Hearn an early release.

Additionally, the other two cases relied upon by the State—Rodriguez v. State, 39 So. 3d 275 (Fla. 2010), and Moore v. State, 132 So. 3d 718 (Fla. 2013)—are distinguishable from this case.  In Rodriguez, the defendant claimed that there was a suppressed deal that in exchange for a witness's cooperation, the witness was provided with special accommodations, including unsupervised visits with his family and conjugal visits with his wife while in jail.  39 So. 3d at 289.  The witness testified at trial and at the postconviction evidentiary hearing, that he had sexual relations with his wife during her visits but that he did not know whether the police were aware of it.  Id.  The lower court rejected the claim because it found that this witness's statements lacked credibility; however, the court found credible the police officers, who had testified at the evidentiary hearing that they were not

aware of the witness having sex with his wife and denied granting him permission to do so.  Id.  The lower court's determination came down to a credibility determination, and this Court determined that there was competent, substantial evidence to support the lower court's denial of the claim for failure to establish the first prong of either a Brady or Giglio violation.  Id. at 290.

Unlike in Rodriguez, where the statement that the lower court found to be not credible was the only support for the claim, the postconviction court here relied on multiple pieces of evidence pointing to a deal between the State and Hearn contingent upon either the State's satisfaction with the outcome of the trial or with Hearn's testimony.  In this case, the postconviction court made credibility findings and factual findings concerning the falsity of Hearn's trial testimony and the prosecution's knowing complicity.

Similarly, Moore is distinguishable.  There, the codefendant testified that he did not have a plea deal at the time of trial, and this Court determined that there was no evidence supporting the defendant's allegations that the witness acknowledged a secret plea agreement.  132 So. 3d at 725.  The postconviction testimony did not establish that the trial testimony was false.  Id. at 725-26.  Here, on the other hand, it is established that Hearn's trial testimony that his deal was to get a life sentence was false because Bowden's postconviction testimony has made

clear that the deal was not for a life sentence, but rather an unknown sentence at the mercy of the State.

"The thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Craig v. State, 685 So. 2d 1224, 1226-27 (Fla. 1996). The record establishes that here, the jury did not know the facts that might have motivated Hearn to testify. Hearn gave false testimony that the State did not correct. At the postconviction evidentiary hearing, Bowden, the prosecutor on the case in 1975, testified that the deal was a "straight up" deal for second-degree murder at the mercy of the State and the judge. This contrasts with Hearn's 1975 testimony that the deal was that he would receive a life sentence, although he acknowledged the theoretical possibility that with a second-degree murder charge he "could" get a lesser sentence than life or that his life sentence would involve early parole eligibility.

The postconviction court also relied upon evidence that the State, after recommending a sentence of fifteen years, engaged in persistent efforts to assist Hearn in being released from prison early by sending letters to the parole board starting the day that Hearn was sentenced and speaking with parole authorities about Hearn. The first letter sent on the day of Hearn's sentence recommended that Hearn be housed in a particular institution, but in the next letter, sent only two

months later, Bowden was already referring to Hearn as "an excellent candidate for early release." In this case, the post-testimony efforts of the State were just further support—in addition to the other evidence—that the actual agreement between the State and Hearn was not a deal for a life sentence, but was contingent upon the State's satisfaction with the end result. "[T]he fact that the witness was unaware of the exact terms of the agreement only increased the significance, for the purpose of assessing his credibility, of his expectation of favorable treatment." Porterfield v. State, 472 So. 2d 882, 884 (Fla. 1st DCA 1985) (citing Campbell v. Reed, 594 F.2d 4, 7 (4th Cir. 1979)). Essentially, "[s]ince a tentative promise of leniency could be interpreted by the witness as being contingent on his testimony, there would be an even greater incentive for him to 'make his testimony pleasing to the prosecutor.'" Id.

The postconviction court found that the State knew that Hearn's testimony that he would be getting a life sentence was false, and such finding is supported by competent, substantial evidence. The false testimony in this case concerned the true nature of Hearn's deal with the State, which the prosecutors failed to correct. Just as in Craig, in which the codefendant/witness had already been granted work release but the prosecutor "did everything possible to convey to the jury" that the witness "would never be released from prison," the jury here was made to believe that it was highly likely that Hearn would never be released from prison, and

- 35 -

therefore had no reason to lie. 685 So. 2d at 1228. In reality, the State knew that Hearn would not be getting a life sentence.

Given that the first two prongs of <u>Giglio</u> have been met, Hearn's testimony is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. <u>Green</u>, 975 So. 2d at 1106. The State has the burden of proving that the false testimony was harmless beyond a reasonable doubt. <u>Id.</u>

The State argues that there was "overwhelming evidence" against Dougan such that even if Hearn's testimony were disregarded, any error in the jury not being told of the true nature of the deal with Hearn is harmless beyond a reasonable doubt under <u>Giglio</u>, and is also not material under <u>Brady</u>. The State specifically points to evidence related to the tape recordings and other statements made after the crime. The State also argues that a handwriting expert identified Dougan as having written the note found near the victim's body and that an expert identified Dougan's fingerprints on an envelope used to mail one of the tapes.

The harmless error test, however, is not one of overwhelming evidence. <u>See</u> <u>Gore v. State</u>, 964 So. 2d 1257, 1266 n.12 (Fla. 2007). Rather, under a harmless error analysis, the State has the burden of proving that the error was harmless beyond a reasonable doubt. <u>Id.</u> (citing <u>Ponticelli v. State</u>, 941 So. 2d 1073, 1088 (Fla. 2006)). And, here, the State has not met that burden. Hearn was undoubtedly the State's key witness. There is ample support that Hearn's testimony was critical

to the State's case, including the statements of the prosecutors themselves.  See

Kyles v. Whitley, 514 U.S. 419, 444 (1995) ("The likely damage [of a witness's

suppressed statements] is best understood by taking the word of the prosecutor.").

At Hearn's sentencing hearing, Prosecutor Bowden said, "I state with

absolute certainty that without the testimony of William Hearn the State could not

have achieved the results that were achieved in the trial before this Court."  He also

stated that prosecuting Dougan without making a deal with Hearn "was an absolute

impossibility"; that "Mr. Hearn was a principal State witness"; that Hearn was

"highly instrumental in the State's success"; and that Hearn provided "substantial

and valuable testimony."  Bowden also testified at the postconviction hearing that

Hearn was critical to the State in Dougan's case.  Assistant Attorney General Kunz

referred to Hearn as the key witness in a 1987 memo.  Kunz testified at the

postconviction hearing that the State could not have achieved the results in the case

without Hearn's cooperation and testimony.  In 1976, State Attorney Ed Austin

credited Hearn with giving the State "two electric chair cases and two 199-year

cases," referring to Dougan and Barclay's death sentences, and Evans' and

Crittendon's 199-year sentences, before Barclay's sentence was vacated by this

Court.  See Barclay, 470 So. 2d at 695-96 (vacating Barclay's death sentence and

imposing a sentence of life in prison).

The record also supports the prosecutors' assertions about Hearn's importance to the State's case. Other than Hearn's testimony, there was no eyewitness account of what happened the night of the victim's death. None of the codefendants implicated Dougan as committing the killing, and they all denied being present for the murder. They testified at trial that they participated or were present in making the tape recordings after the fact but all four denied having any role in the victim's death. In other words, they claimed the tapes were made to send a message to the community about black oppression, but that the message was not based on their own participation in this crime.

There was also conflicting testimony about who conceived the idea to make the recordings and who participated in providing material for the scripts. For example, there was testimony that some of the details, such as the fact that the victim begged for mercy, were fabricated to make the tapes more "aggressive." Dougan's fingerprints on the envelope used to mail one of the tapes does not establish that Dougan committed the murder because he admitted to participating in the recording and mailing of the tapes. Dougan's mailing of a tape does not illuminate what actually occurred on the night of the murder. As the postconviction court wrote, "[a] thorough review of the record and evidence presented support that Mr. Hearn was the State's key witness and the only witness who testified to personal knowledge of the offense."

Furthermore, the State would not have been able to establish that Dougan committed first-degree murder without Hearn's testimony, when considering his relative culpability. Three of the defendants alleged to be present for the murder were convicted of second-degree, rather than first-degree, murder. As Bowden, who prosecuted Dougan, made clear at Hearn's sentencing hearing, Hearn's testimony was instrumental in convincing the jury of Dougan's level of participation and culpability in the crime itself in order to support the first-degree murder conviction.

Significantly, Hearn had a clear motive to testify favorably for the State to pin the blame on Dougan and lessen his own responsibility as a participant in the crime. There was certainly evidence supporting a greater involvement by Hearn in the actual murder, including that he fled the state following the murders; his gun was the gun used in the victim's murder; and his car was used to drive around the defendants during both this murder of Orlando and the murder of Roberts. These circumstances and the State's offer of a "straight up" deal at the State's mercy all gave Hearn a clear motive to testify in a manner favorable to the State.

Finally, the State also argues that Hearn's testimony was corroborated by the testimony of Mattison, Black, and Bess. However, Hearn had read the statements of Mattison, Black, and Bess before he sought his plea deal and testified in deposition and at trial. In other words, Hearn was already aware of the testimony

of Mattison, Black, and Bess when he offered testimony that appeared to be mutually corroborating. Additionally, neither Mattison, Black, nor Bess were eyewitnesses to the murder.

Under the Giglio materiality prong, there is a reasonable possibility that Hearn's testimony could have affected the jury's verdict. Mungin, 79 So. 3d at 738. The jury was under the impression that Hearn was receiving a life sentence under a second-degree murder charge and that, based on Hearn's explanation at trial, this was more preferable than a life sentence under a first-degree murder charge because it allowed the possibility that he could be released on parole sooner. If the jury believed that Hearn had a fixed, pre-determined sentence, albeit with the theoretical possibility of an early parole, it would suggest to a juror that Hearn had no reason to lie, and that he was contrite in accepting the punishment for his involvement in the crime. But with a contingent sentence at the mercy of the State, the jury may have believed Hearn had a reason to lie and would therefore question his credibility.

As the postconviction court explained, Hearn's "credibility was more the nucleus of the State's case against [Dougan] than a peripheral component." Because Hearn was the State's key witness, if the true nature of his agreement had been disclosed, he could have been cross-examined about it, and it could have

seriously undermined his credibility, consequently undermining the "nucleus of the State's case" against Dougan.

Accordingly, we agree with the postconviction court that a <u>Giglio</u> violation was established.  Dougan is therefore entitled to a new trial, and as to this issue we need not address any <u>Brady</u> violation.  While the <u>Giglio</u> violation alone requires granting a new trial, we discuss the substantial issues arising from Dougan's counsel's conduct and performance as that reinforces our decision that relief must be granted. The entire trial was tainted, not just by the false testimony of Hearn, but as next discussed, by Dougan's own counsel's performance as well.

## II.  Guilt Phase Counsel's Performance—Conflict of Interest and Ineffective Assistance of Counsel

The State also argues that the postconviction court erred in granting relief on portions of Dougan's multipart claim XI, in which Dougan argued that his guilt phase counsel labored under an actual conflict of interest and also provided ineffective assistance.  Specifically, Dougan claimed and the postconviction court found significant failures in the conduct of Dougan's guilt phase counsel, Ernest Jackson, based both on conflicts of interest that adversely affected his performance as well as his failure to investigate a defense to the charges and making promises in opening statement that were not fulfilled during the trial.  Claims of ineffective assistance of counsel are governed by the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and its progeny.

- 41 -

Claims of an attorney's conflict of interest are a subset of ineffective assistance of counsel claims under Strickland because the right to effective assistance of counsel encompasses the right to representation free from actual conflict. Hunter v. State, 817 So. 2d 786, 791 (Fla. 2002) (citing Strickland, 466 U.S. at 688).

The following standard of review applies to Strickland claims based upon an alleged conflict of counsel:

> [I]n order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction."

Id. at 791-92 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)). The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. See Cuyler, 446 U.S. at 342; Quince v. State, 732 So. 2d 1059, 1064 (Fla. 1999).

Once a defendant satisfies the Cuyler test that we explained in Hunter, prejudice is presumed and the defendant is entitled to relief. See Strickland, 466 U.S. at 692; Cuyler, 446 U.S. at 349-50. On the other hand, under standard Sixth Amendment claims of ineffective assistance of counsel, the prejudice prong

requires that the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

> For the second prong, "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." Wong v. Belmontes, [558 U.S. 15, 27] (2009) (quoting Strickland, 466 U.S. at 694). Strickland does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, [558 U.S. 30, 43] (2009) (alteration in original) (quoting Strickland, 466 U.S. at 693-94).

Everett v. State, 54 So. 3d 464, 472 (Fla. 2010). Both the deficiency and prejudice prongs of Strickland present mixed questions of law and fact, so this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the legal conclusions de novo. Hitchcock v. State, 991 So. 2d 337, 346 (Fla. 2008) (citing Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004)).

With these standards in mind, we turn to Dougan's claims of conflict of interest and ineffectiveness of guilt phase counsel for which the postconviction court granted relief and which the State now appeals.

## A. Conflict of Interest

The postconviction court concluded that Ernest Jackson, Dougan's guilt phase counsel, labored under two different conflicts of interests while representing Dougan in the guilt phase: representing Dougan's codefendants, Crittendon and Barclay, in advance of the appeal, and having an affair with Dougan's sister.

Before we delve into the details of Dougan's present claims about Jackson's conflicts of interest during the guilt phase, we should also note that we have previously determined that Jackson failed to provide effective assistance to Dougan during his appellate representation. In addition to representing Dougan during the guilt and penalty phases that took place in 1975, after Dougan was sentenced to death the first time, Jackson also acted as Dougan's appellate counsel in this Court. See Dougan I, 343 So. 2d 1267. Jackson also acted as appellate counsel to Elwood Barclay and Dwyne Crittendon. This Court determined that Barclay received ineffective assistance of appellate counsel as a result of Jackson's appellate representation. Barclay, 444 So. 2d at 959. Through Dougan's petition for writ of habeas corpus, we determined that "Jackson's representation of Dougan suffered from the same major defects as did his representation of Barclay" and granted Dougan a new appeal due to this ineffectiveness resulting from the conflict of interest. Dougan IV, 448 So. 2d at 1006.

With respect to a conflict of interest adversely affecting Jackson's performance during the guilt phase, we agree with the postconviction court that Jackson was operating under an actual conflict of interest. In this subclaim, Dougan claims that Jackson's conflict of interest related to Dougan's codefendants, Crittendon and Barclay, began during Dougan's trial because Jackson solicited the codefendants either during or before the trial, and Jackson failed to distinguish the relative culpability of the defendants or cross-examine Crittendon and Barclay, made no attempt to distance Dougan from the other defendants, and was the only counsel not to seek a severance. This claim is distinct from Dougan's previous claim that Jackson operated under a conflict of interest during Dougan's appellate proceedings in Jackson's capacity as Dougan's appellate counsel and for which this Court already granted Dougan relief. See id.

The postconviction court explained the evidence for this claim in its order. Both Barclay and Crittendon testified that Jackson approached them and told them that he would represent them on appeal, apparently even before the trial began. Crittendon stated that Jackson approached him prior to the trial, outside of the presence of his trial counsel. Crittendon assumed it would be for free because he did not have money to pay, though the matter of payment was not discussed. Barclay testified that Jackson also approached him during a break during the trial

and said, "Don't worry about it. We're probably going to lose this, but I will handle your appeal for you."

Shortly after the defendants were sentenced, Jackson moved to be appointed to represent Barclay and Crittendon on appeal, which was initially denied by Judge Olliff, who stated, "I cannot in good conscience spend the taxpayers' money appointing private counsel until and unless they advise me that there is a conflict of defenses. I think there is a conflict of interest between Dougan and Barclay." Ultimately, however, even though the trial court thought there was a conflict of interest between Dougan and Barclay, Jackson was appointed as counsel for Dougan, Crittendon, and Barclay on appeal.

The postconviction court concluded that an actual conflict of interest existed that adversely affected counsel's performance during the trial:

> Mr. Jackson's interest in and actual solicitation of Mr. Barclay and Mr. Crittendon for appellate representation while representing Defendant was inconsistent with his obligation to Defendant. For trial counsel to distinguish Defendant from his co-defendants at trial would necessitate placing one or the other in a more culpable light. Despite the nature of the trial, the charges, and the crime, Defendant's trial counsel did not cross-examine either co-defendant at Defendant's trial. Defendant's trial counsel made no attempt to distinguish the culpability of Defendant and his co-defendants at trial. This resulted in a conflict of interest.

There is competent, substantial evidence to support this finding that Jackson solicited appellate representation of Dougan's codefendants before or during Dougan's guilt phase trial that adversely affected his performance.

In concluding that there was a conflict of interest in Jackson's representation of Dougan and Barclay on direct appeal, the Court explained that Jackson made no attempt to draw attention to any difference between the two defendants or to "emphasize the rationality of the jury's differentiation" in recommending death for one and life imprisonment for the other. Barclay, 444 So. 2d at 958. "Obviously, Jackson would have been pitting his clients against each other because Barclay could have been made to appear relatively less deserving of death only by making Dougan appear more so." Id. This Court echoed this reasoning in Dougan's case when it determined that Jackson failed to provide effective assistance due to a conflict of interest and a failure to raise meritorious legal claims on Dougan's behalf. Dougan IV, 448 So. 2d at 1006.

This same reasoning extends to Jackson's guilt phase performance. Dougan has identified specific ways in which Jackson's performance in the guilt phase was compromised as a result of his informal agreement to represent Barclay and Crittendon. As identified by the postconviction court, Jackson did not cross-examine either codefendant at trial, nor did he attempt to distinguish the culpability of Dougan and his codefendants at trial.

The State contends that Dougan's argument is undercut by the nature of Dougan's defense: actual innocence because of an alibi. However, it would not be inconsistent with an alibi defense to contrast Dougan with the codefendants or

argue that they had varying degrees of culpability. We conclude that there is competent, substantial evidence to support the existence of a conflict of interest that adversely affected counsel's performance.

The postconviction court also found a conflict of interest because at the time of the trial, Jackson, who was married to his legal secretary, was having an affair with Dougan's sister, Thelma Turner. This affair, which was unknown to Dougan, created turmoil in Jackson's law office during the time of the trial. The postconviction court observed that the relationship "created a substantial risk" that Jackson's "representation of Defendant was materially limited by his responsibilities to Ms. Turner or his own personal interest."

We agree with the trial court's findings. Here, although Turner was Dougan's sister, Dougan's resentencing counsel testified that Turner was "very hostile and not at all friendly." Because there is the additional conflict of interest as well as deficient performance, we need not probe into whether the affair was the reason for Jackson's substandard performance, or whether the reason was his solicitation of the codefendants or simply his own inability to adequately represent Dougan. Suffice it to say, this relationship just emphasizes how poorly Dougan was represented by counsel who had apparent interests other than attempting to effectively and diligently represent Dougan.

Because it has been established that Jackson was operating under an actual conflict of interest, prejudice is presumed. Strickland, 466 U.S. at 692. The United States Supreme Court stated in Strickland, when there is an actual conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." Id. As explained above, Jackson was burdened by at least one actual conflict of interest: his arrangement to represent Dougan's codefendants on appeal that occurred before or during the guilt phase. Dougan identified specific evidence that suggests that guilt phase counsel's interests were compromised, and we thus presume that Dougan has satisfied the prejudice prong of the Strickland analysis with respect to the conflict of interest. However, we next identify other instances of ineffectiveness, which further undermined the fairness of this trial.

### B. Guilt Phase Counsel's Failure to Investigate and Present a Defense

In conjunction with Dougan's counsel's conflict of interest, we address Dougan's subclaim that guilt phase counsel, Jackson, did not investigate and prepare to determine whether and how to present a defense to the charges, and that defense counsel made promises in opening statement that were not fulfilled during the trial. In accordance with Strickland, this Court employs the standard of review to claims of ineffective assistance of counsel provided above.

The postconviction court found that guilt phase counsel did not attempt to corroborate Dougan's alibi testimony by a disinterested source or evidence; attempted, unsuccessfully, to impeach defense witnesses; claimed surprise as to the testimony of multiple defense witnesses; presented testimony that was contrary to the stated theory of defense; and admitted to not speaking to witnesses until the day of their trial testimony. In the opening statement, cocounsel, Deitra Micks, stated that the victim did not work, that he had sold narcotics, and that the police did not investigate the victim's white acquaintances—assertions that were lacking in support or were refuted by the evidence. We conclude that these findings are supported by competent, substantial evidence.

We agree with the postconviction court's conclusion, based on its findings, that Dougan has demonstrated that guilt phase counsel was deficient. Defense counsel claimed "surprise" as to multiple defense witnesses and did not come anywhere close to establishing the claims made in opening argument that the police did not investigate white people, that the victim sold drugs, or that one of the victim's acquaintances were involved in the murder.

Deficient performance of counsel arises when counsel argues a defense in opening and presents no evidence to support the defense during trial. Avery v. State, 737 So. 2d 1166, 1167 (Fla. 2d DCA 1999); see also Harris v. Reed, 894 F.2d 871, 879 (7th Cir. 1990) (explaining that counsel "primed the jury" to hear

evidence, failed to present it, and "the jury likely concluded that counsel could not live up [to] the claims made in the opening"). Further, the defense stated that its theory of defense was to show that the victim was engaged in the sale of narcotics, had a bad temper and had altercations with people because he was in a high risk business that would explain "the kind of mysterious death he died." This theme, the failure to establish it, and also claiming surprise to a number of the defense's own witnesses and stating that they had not spoken to the witnesses until the very morning they were to testify, demonstrates counsel's lack of preparedness.

The State's brief refers to the defense presentation of witnesses as "build[ing] upon themes established through their cross-examinations." Although the Court normally defers to the tactical decisions of counsel and Dougan must overcome the presumption that the challenged actions might be sound trial strategy, we conclude that Dougan has met that burden. See Twilegar v. State, 175 So. 3d 242, 248 (Fla. 2015). Arguing that the victim "was engaged in the sale of narcotics; that he had a high temper, and was involved in many altercations with people" because he was in a "high risk type of business" and that "because of his temperament" he would be subject to the "kind of mysterious death that he died" with absolutely no support for these assertions cannot be considered reasonable strategy. Therefore, it cannot be presumed to be a tactical decision.

Having concluded that the deficiency prong of Strickland has been met, we must next consider the "prejudice" prong of the Strickland test, which we have explained above. Under this prong, Dougan must show how he was prejudiced by guilt phase counsel's ineffectiveness. See Strickland, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.").

This case demonstrates a classic breakdown in the adversary process for Dougan. During the opening statement, the State objected multiple times, and many of the objections were sustained. Some were even accompanied by admonishment by the trial court. For instance, Ms. Micks stated that there were narcotics found on the victim's body, and when the prosecutor objected that this was a misstatement, the trial court warned, "Don't pursue it." The jury heard the objection and admonishment. The jury also witnessed defense counsel's claim of surprise to many of the defense's own witnesses. After defense counsel asked a defense witness, one of the victim's classmates, whether the victim sold heroin, the prosecutor described it as such in a bench conference: "this is one of the grossest misstatements of facts of the totality of these young peoples' testimony that I have ever heard in my life." After this, the jury heard the prosecutor's sustained objection to defense counsel's effort to lay a predicate to the contention, including,

"this is irrelevant, immaterial, incompetent." Outside the presence of the jury, the prosecutor described defense counsel's theory of the case as "the most irresponsible statement I have heard a lawyer make." During the testimony of another defense witness, the trial court stated, outside the presence of the jury, "apparently the defense is attempting to impeach their own witness by prior deposition, declaring surprise" but "I have [a] contrary interpretation of what the deposition says." The jury heard other admonishments from the trial court, including when defense counsel attempted to get one of the defense witnesses to give a certain answer, and the trial court stated following the State's objection, "Don't argue with your witness."

With respect to this subclaim, the postconviction court determined that Dougan demonstrated prejudice because the specific acts and omissions "were so serious as to undermine confidence in the outcome." We agree with the postconviction court that Dougan has demonstrated the requisite prejudice. In addition, because prejudice is presumed as a result of the actual conflicts of interest, there is no question that Dougan is entitled to relief.

### III. Cumulative Error

This Court has recognized under unique circumstances that where multiple errors are found, even if they are individually harmless, the cumulative effect of such errors can deprive a defendant of the fair and impartial trial that is the

- 53 -

inalienable right of all litigants.  See Jackson v. State, 575 So. 2d 181, 189 (Fla. 1991); see also McDuffie v. State, 970 So. 2d 312, 328 (Fla. 2007).  Where several errors are identified, the Court "considers the cumulative effect of evidentiary errors and ineffective assistance claims together."  Suggs v. State, 923 So. 2d 419, 441 (Fla. 2005).

We have concluded that the postconviction court's factual conclusions are supported by competent, substantial evidence and that legally they rise to the level of a Giglio violation.  Dougan's counsel also labored under an actual conflict of interest while representing Dougan during the guilt phase of the trial, and otherwise provided ineffective assistance.  The Giglio claim alone warrants relief, but our analysis of the cumulative effect of these errors supports our conclusion that Dougan's trial was tainted by a combination of errors and deficiencies that entitle him to a new trial.

## CONCLUSION

Dougan's trial was tainted by the cumulative effect of a Giglio error as well as constitutionally deficient performance on the part of his defense counsel, who was laboring under a conflict of interest.  For all the reasons set forth in this opinion, we affirm the postconviction court's order granting a new trial and remand for a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

Dougan's trial was tainted by the significant <u>Giglio</u> violation committed by the State and his trial counsel's ineffectiveness and conflict of interest. As a result of these cumulative errors, there can be no confidence in the jury's verdict of guilt or Dougan's death sentence. I therefore concur in the unanimous decision of this Court to affirm the trial court's granting of a new trial.

Undoubtedly, this case involving a 1974 Jacksonville murder conviction is a sad reminder of the turbulent times that existed in Jacksonville at that time. However, while I concur with the unanimous opinion, I would also point out that this Court's decision to affirm the defendant's death penalty after his third resentencing was only by a vote of four-to-three. <u>Dougan v. State</u>, 595 So. 2d 1 (Fla. 1992).

Justice McDonald, joined by Chief Justice Shaw and Justice Barkett, dissented, explaining why Dougan's sentence should have been reduced to life based on the substantial mitigation related to Dougan's background. <u>Id.</u> at 6-8 (McDonald, J., dissenting). In that dissent, Justice McDonald recognized that this case was a tragedy on many levels. As Justice McDonald wrote:

- 55 -

Dougan's mother was white and his father, whom he never knew, was black. After Dougan's birth, his mother returned to an all white community where she abandoned her son. Although as much white as black, Dougan was rejected by his white relatives and the white population. Ultimately he was adopted by an understanding and compassionate family which also came from a biracial background. An intelligent person, Dougan was well educated and became a leader in the black community, but throughout his life was confronted with a perception of injustice in race relations. Within the black community he was respected. He taught karate and counseled black youths. When blacks were refused service at a lunch counter, he participated in a sit-down strike in defiance of a court order and was held in contempt of court therefor. This was the only blemish, if it can be called one, on his police record until this homicide.

The events of this difficult case occurred in tumultuous times. During the time of the late sixties and early seventies, there was great unrest throughout this country in race relations. Duval County, where this homicide occurred, did not escape and was also a place of such unrest. . . .

The trial judge was aware of everything I have stated. Indeed, he substantially recited these facts in his sentencing order. His final conclusion was that the grossness of the homicide clearly outweighed any other factor or combination thereof which may have lessened the ultimate penalty. The majority agrees, but I cannot.

 . . . This case is not simply a homicide case, it is also a social awareness case. Wrongly, but rightly in the eyes of Dougan, this killing was effectuated to focus attention on a chronic and pervasive illness of racial discrimination and of hurt, sorrow, and rejection. Throughout Dougan's life his resentment to bias and prejudice festered. His impatience for change, for understanding, for reconciliation matured to taking the illogical and drastic action of murder. His frustrations, his anger, and his obsession of injustice overcame reason. The victim was a symbolic representative of the class causing the perceived injustices.

In comparing what kind of person Dougan is with other murderers in the scores of death cases that we have reviewed, I note that few of the killers approach having the socially redeeming values of Dougan. In comparison to Dougan's usual constructive practices, this homicide was indeed an aberration. He has made and, if allowed to live, can make meaningful contributions to society.

. . . A life sentence makes this penalty more proportionate to what has existed in emotional or other racially caused homicides.

Such a sentence reduction should aid in an understanding and at least a partial reconciliation of the wounds arising from discordant racial relations that have permeated our society. To a large extent, it was this disease of racial bias and discrimination that infected an otherwise honorable person and contributed to the perpetration of the most horrible of crimes. An approval of the death penalty would exacerbate rather than heal those wounds still affecting a large segment of our society.

Accordingly, I believe that the death penalty should be vacated and that Dougan's sentence should be reduced to life imprisonment without eligibility for parole for twenty-five years from the date of his incarceration for this murder.

Id. at 7-8 (footnote omitted).

Clearly, this is a case of many tragedies. It is tragedy for the family of the young man who was murdered. It is a tragedy that over forty years have passed since the murder occurred, of which Dougan has spent most of those years on death row. He now faces a retrial where he may be released from death row or even acquitted. It is a tragedy that Dougan, a young man with so much potential, was possibly involved in this murder that was motivated by racial hatred. It would be overly simplistic, however, to characterize this murder and trial merely as a byproduct of an earlier time when Jacksonville was dealing with deep wounds of past racial discrimination.

At the very least, I agree with the three original dissenters of this Court during Dougan's appeal of his third resentencing that the death penalty in this case, where the jury vote after his third resentencing was only nine-to-three, should have

been reduced to life for Dougan.  See id.  However, that issue is not before us in this postconviction proceeding.  Justice is at times an elusive word, but by granting Dougan a new trial, we restore some small measure of justice to remedy the injustices that occurred at the time of his original trial.

An Appeal from the Circuit Court in and for Duval County,
        Jean Long Johnson, Judge - Case No. 161974CF004139AXXXMA

Pamela Jo Bondi, Attorney General, and Carine L. Mitz, Assistant Attorney General, Tallahassee, Florida,

        for Appellant/Cross-Appellee

Mark Evan Olive of the Law Offices of Mark E. Olive, P.A., Tallahassee, Florida; and Kenneth Howard Haney and Tina M. Eckert of Quarles & Brady, LLP, Naples, Florida,

        for Appellee/Cross-Appellant

Peter Morlu Brima Sao Dennis, Fort Myers, Florida; and Bryan A. Stevenson and Jennifer R. Taylor of the Equal Justice Initiative, Montgomery, Alabama,

        for Amicus Curiae Equal Justice Initiative